RICHARD DAHILL *vs.* POLICE DEPARTMENT OF BOSTON.

Suffolk. March 5, 2001. - May 25, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Anti-Discrimination Law,* Employment, Handicap. *Employment,* Discrimination. *Police Officer. Words,* "Handicap."

This court concluded that G. L. c. 151B, the antidiscrimination statute, does not require consideration of mitigating or corrective devices in determining whether a person has a "handicap" as defined by G. L. c. 151B, § 1(17). [236-244]

CERTIFICATION of a question of law to the Supreme Judicial Court by the United States District Court for the District of Massachusetts.

*Harold L. Lichten* (*Shannon Liss-Riordan* with him) for the plaintiff.

*William V. Hoch* for the defendant.

The following submitted briefs for amici curiae:

*Stanley J. Eichner, Jane Alper & Bennett H. Klein* for Disability Law Center & others.

*Cynthia L. Amara & Loretta M. Smith* for Associated Industries of Massachusetts.

*Arthur G. Telegen, Anjali Parekh Prakash, Robert A. Fisher, Sharon R. Burger & Marc A. Polk* for Boston Area Management Attorneys Group.

*Thomas F. Reilly,* Attorney General, *Catherine C. Ziehl & Louisa M. Terrell,* Assistant Attorneys General, for the Attorney General.

MARSHALL, C.J. This case is here on certification from the United States District Court for the District of Massachusetts, pursuant to S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981). The question certified, which concerns the definition of the term "handicap" in the Massachusetts antidiscrimination statute, G. L. c. 151B, is as follows: "Whether Massachusetts

General Laws c. 151B requires consideration of mitigating or corrective devices in determining whether a person has a handicap."[1]

I

The relevant background is contained in the memorandum and order of the District Court judge in which he denied in part and granted in part a motion for summary judgment of the police department of Boston. See S.J.C. Rule 1:03, § 3 (2). We summarize only those facts that illuminate our resolution of the certified question.

Richard Dahill was born with a severe hearing impairment. At the age of three he began receiving medical care for his hearing loss and wearing hearing aids. He continued to receive medical care until the age of thirteen, when his hearing stabilized. Without the use of hearing aids, Dahill's hearing remains significantly impaired. With the use of hearing aids, his hearing is corrected to within normal limits. It is his use of hearing aids that raises the question we must answer.

Despite his severe hearing impairment, Dahill has achieved a wide range of academic and vocational success. His childhood medical records, which document extensive audiological evaluations and assessments, report above-average performance in school. He is a certified high school English teacher, and has worked as a lifeguard and health club worker. Dahill attended and has graduated from college and law school.

In 1996, he applied for a position as a Boston police officer. In February, 1997, he received a conditional offer of employment, subject to meeting the medical standards promulgated by the Commonwealth's human resources division. After conducting an auditory examination, the department's physician, Dr. Luther Arnold, determined that Dahill had a "Category B Condition," which does not automatically disqualify a person from

---

[1]We acknowledge amicus curiae briefs filed by the Attorney General; Associated Industries of Massachusetts; Boston Area Management Attorneys Group; and Disability Law Center, Gay & Lesbian Advocates & Defenders, AIDS Action Committee of Massachusetts, AIDS Project Worcester, Inc., and American Association of Retired Persons.

employment as a police officer.[2] Dr. Arnold certified that Dahill met the Commonwealth's hearing requirements with the use of his hearing aids.[3]

Dahill subsequently entered the Boston Police Academy for a twenty-six week training program required of all new police officers. At the academy, several episodes occurred that raised concerns on the part of the department that Dahill's hearing might make him unfit to be a police officer. In one incident Dahill did not respond to an oral instruction to retrieve water bottles after a training run. On another occasion he did not respond to a radio call. He also did not hear a gunshot during a firearms training exercise. Dahill has offered explanations for these incidents, but they are not germane to the issue before us.

After receiving reports of the episodes, Dr. Arnold again evaluated Dahill's hearing, and sent Dahill to another specialist for auditory tests.[4] On the basis of his examination, the specialist's report, and the instructors' reports of Dahill's training, Dr. Arnold sent a report to the police commissioner of Boston stating that "[t]here remains a major question [of] safety" regarding Dahill's ability to perform the duties of a police officer. The department then terminated Dahill, explaining to him that his "auditory deficiencies" rendered him "incapable of effectively and safely performing the essential duties of a Police Officer."

Dahill sued, claiming that his termination violated the Massachusetts antidiscrimination statute, G. L. c. 151B, § 4; the

[2]A "Category B Condition" is defined as "a medical condition that, based upon its severity or degree, may or may not (1) preclude an individual from performing the essential functions of a municipal fire fighter or police officer in a training or emergency operational environment, or (2) present a significant risk to the safety and health of that individual or others."

[3]Dr. Arnold relied in part on the opinion of Dr. Samuel Merchant, who diagnosed Dahill with bilateral stable congenital sensorineural hearing loss. Dr. Merchant concluded that training for the Boston Police Academy "should not pose a significant risk to [Dahill's] hearing loss" and endorsed Dahill's application to enter the academy.

[4]The hearing specialist concluded that "[h]earing loss of this degree will cause major difficulty in communication excepting in quiet settings in which the subject is able to directly face the speaker . . . . [T]he expected acoustic environments in police duty will present a major communication difficulty for this officer."

Massachusetts equal rights statute, G. L. c. 93, § 103; the Federal Rehabilitation Act, 29 U.S.C. § 794 (2000), and the Americans with Disabilities Act (ADA), 29 U.S.C. §§ 12101 et seq (2000).

## II

We are asked to decide only whether a person who brings a claim pursuant to G. L. c. 151B, § 4 (16),[5] has a "handicap" as defined by G. L. c. 151B, § 1 (17),[6] if the person's impairment has been or can be alleviated by the use of corrective devices or other mitigating measures.

The department urges that we be guided by the decision of the United States Supreme Court in *Sutton* v. *United Air Lines, Inc.*, 527 U.S. 471 (1999), where the Court concluded that, under the ADA, "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures — both positive and negative — must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled.' " *Id.* at 482. The ADA defines "disability,"[7] in part, as: "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102 (2).

[5]General Laws c. 151B, § 4 (16), provides that it shall be an unlawful practice "[f]or any employer . . . to dismiss from employment or refuse to hire . . . or otherwise discriminate against, *because of his handicap*, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business" (emphasis added).

[6]General Laws c. 151B, § 1 (17), defines "handicap" as "(*a*) a physical or mental impairment which substantially limits one or more major life activities of a person; (*b*) a record of having such impairment; or (*c*) being regarded as having such impairment." A "handicapped person" is defined as any person who has a "handicap" under that statutory definition. G. L. c. 151B, § 1 (19).

[7]Federal legislation now uses the term "disability" rather than "handicap." See Rehabilitation Act Amendments of 1992 (Pub. L. No. 102-569, 106 Stat. 4344 [1992], codified at 29 U.S.C. § 705 [20][B]) and Americans with Disabilities Act (Pub. L. No. 101-336, 104 Stat. 327 [1990], codified at 42 U.S.C. §§ 12101 et seq. [2000]). The District Court judge noted that the change in terminology reflects "a congressional effort to use currently acceptable terminology," but that no "distinction in substance" appears intended by the different phraseology.

Because the definition of "handicap" contained in G. L. c. 151B, § 1 (17) ("a physical or mental impairment which substantially limits one or more . . . major life activities"), is essentially identical, the department suggests that the interpretation of the Federal statute by the Supreme Court compels a similar reading of the Massachusetts statute. We must first ascertain what the Massachusetts Legislature intended in 1983 when it amended our antidiscrimination statute to prohibit unlawful employment discrimination of handicapped persons, G. L. c. 151B, § 1 (17), § 4 (16), inserted by St. 1983, c. 533, §§ 2, 6, before we consider the Supreme Court's interpretation of a Federal statute enacted in 1990, seven years later. See Pub. L. 101-336, § 2, 104 Stat. 328 (1990).

The language of the Massachusetts statute is not dispositive. Cf. *Acting Superintendent of Bournewood Hosp.* v. *Baker*, 431 Mass. 101, 104 (2000). The statute draws a distinction between persons who have a physical or mental impairment, and those whose impairment "substantially limits" a "major life" activity. G. L. c. 151B, § 1 (17) (*a*). Only the latter are protected by the Massachusetts statute. But the statute is silent as to whether mitigating measures or corrective devices must be considered in determining whether a person with an impairment falls into the protected or nonprotected category. A person with a hearing impairment might experience no "substantial limit" of a "major life activity," even though he uses no corrective device: he would not be protected under the statute. A person with a hearing impairment might, even while using his corrective hearing aids, still suffer a "substantial limit," and thus would be protected. Finally, a person with a hearing impairment might experience a "substantial limit" of a "major life activity" when not using his hearing aids, but not experience any such "substantial limit" while the corrective devices were in use. The statute does not resolve whether this last person would be protected.

Because the language of the statute does not end our inquiry, we turn to other sources to discern the Legislature's intent. *Acting Superintendent of Bournewood Hosp.* v. *Baker, supra* at 104. The legislative history of G. L. c. 151B is instructive. In 1983, when the Legislature amended G. L. c. 151B to extend

protection from unlawful employment discrimination to "handicapped" persons, St. 1983, c. 533, § 2, the Legislature explicitly patterned the definition of "handicap" on the definition of "handicap" contained in a Federal statute enacted ten years earlier, the Federal Rehabilitation Act of 1973, 29 U.S.C. § 706 (6) (2000). See *Talbert Trading Co.* v. *Massachusetts Comm'n Against Discrimination,* 37 Mass. App. Ct. 56, 60 (1994).[8] At that time no court had determined, or, to our knowledge considered, whether "handicapped" referred to a person's impairment in its corrected or mitigated condition; corrective devices or other mitigating measures were simply not relevant. See, e.g., *Strathie* v. *Department of Transp.,* 716 F.2d 227, 228-230 (3d Cir. 1983) (bus driver with controlled hearing impairment assumed to be "handicapped"); *Davis* v. *Ohio Barge Line, Inc.,* 535 F. Supp. 1324, 1325 (W.D. Pa. 1982), vacated on other grounds, 697 F.2d 549 (3d Cir. 1983) ("controlled epileptic" assumed to be handicapped). We presume that in 1983 the Legislature was aware of the then-existing case law interpreting the Federal statute, and that it must have intended the term "handicap" in the Massachusetts statute to be interpreted in a manner that was consistent with the then-existing Federal jurisprudence.[9] See *Duarte* v. *Healy,* 405 Mass. 43, 47 (1989) (Legislature presumed to be aware of United

---

[8]The Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq. (2000), which provides protection to handicapped individuals from discrimination under any program or activity receiving Federal financial assistance, was amended in 1974 to define "handicapped individual" as *"any person who (A) has a physical or mental impairment which substantially limits one or more of such person's major life activities,* (B) has a record [of] such an impairment, or (C) is regarded as having such an impairment" (emphasis added). See Pub. L. No. 93-516, § 111(a), 88 Stat. 1617, 1619 (1974) (codified at 29 U.S.C. § 706 [8][B]). The Massachusetts Legislature originally defined "handicapped person" under G. L. c. 151B as *"any person who has a physical or mental impairment which substantially limits one or more of such person's major life activities"* (emphasis added). St. 1983, c. 533, § 2. Since 1983, there have been two amendments to the Massachusetts definition, but the operative language has not changed. In 1989, the Legislature made technical changes to the definition of "handicapped person" to bring G. L. c. 151B into compliance with the Federal Fair Housing Amendments Act of 1988. See St. 1989, c. 722, §§ 11, 12. In 1995, it excluded from the definition current, illegal use of a controlled substance. See St. 1995, c. 179, § 14.

[9]In later cases decided under the Rehabilitation Act, Federal courts were split as to whether that statute requires consideration of mitigating measures.

States Supreme Court case interpreting 42 U.S.C. § 1983 when it patterned Civil Rights Act after § 1983).

Guidance provided by the Massachusetts Commission Against Discrimination (MCAD) on this issue is also illuminating. In 1998, the MCAD issued guidelines that provide that "[t]he existence of an impairment is generally determined without regard to whether its effect can be mitigated by measures such as medication, auxiliary aids or prosthetic devices." Massachusetts Commission Against Discrimination Guidelines: Employment Discrimination on the Basis of Handicap Chapter 151B § II.A.7 (1998). The guidelines explain that "an employee who is legally blind, but whose vision is correctable with glasses, may be considered 'handicapped' because his impairment substantially limits his ability to perform the major life activity of seeing." *Id.* The Legislature has delegated to the MCAD the authority to "formulate policies to effectuate the purposes" of G. L. c. 151B and to "adopt, promulgate, amend and rescind rules and regulations" to implement those policies. G. L. c. 151B, §§ 2, 3 (5). The guidelines represent the MCAD's interpretation of G. L. c. 151B, and are entitled to substantial deference, even though they do not carry the force of law. See *Berrios* v. *Department of Pub. Welfare*, 411 Mass. 587, 595 (1992), quoting A. Cella, Administrative Law and Practice § 747 (1986) (administrative agency "has considerable leeway in interpreting a statute it is charged with enforcing"); *Bynes* v. *School Comm. of Boston*, 411 Mass. 264, 269 (1991) (interpretations of G. L. c. 151B offered by MCAD are "entitled to substantial deference"); *Rock* v. *Massachusetts Comm'n Against Discrimination*, 384 Mass. 198, 206 (1981) (MCAD, not courts, has primary responsibility to determine scope of G. L. c. 151B). It is particularly appropriate to defer to the MCAD's interpretation where, as here, the legislative policy is

Compare *Chandler* v. *Dallas*, 2 F.3d 1385, 1390-1391 (5th Cir. 1993), cert. denied, 511 U.S. 1011 (1994) (correctable vision not "handicap"), with *Davis* v. *Meese*, 692 F. Supp. 505, 517 (E.D. Pa. 1988), aff'd, 865 F.2d 592 (3d Cir. 1989), citing *School Bd. of Nassau County* v. *Arline*, 480 U.S. 273 (1987) ("An insulin-dependent diabetic is clearly a 'handicapped person' within the meaning of the Rehabilitation Act"), and *Wallace* v. *Veterans Admin.*, 683 F. Supp. 758, 761 (D. Kan. 1988) (finding that rehabilitated drug addict is "handicapped individual" without considering impact of rehabilitation).

"only broadly set out in the governing statute." *Id.* at 204, quoting *School Comm. of Wellesley* v. *Labor Relations Comm'n,* 376 Mass. 112, 116 (1978).

The public policies underlying G. L. c. 151B, § 4 (16), are clear: to protect "handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of [employers] as avoiding exposing others to significant health and safety risks." *Cox* v. *New England Tel. & Tel. Co.,* 414 Mass. 375, 383-384 (1993), quoting *School Bd. of Nassau County* v. *Arline,* 480 U.S. 273, 287 (1987). An interpretation that the term "handicap" does not require consideration of corrective devices is consistent with that broad mandate. An alternative interpretation excludes from the statute's protection numerous persons who may mitigate serious physical or mental impairments to some degree, but who may nevertheless need reasonable accommodations to fulfil the essential functions of a job.[10]

The Legislature has directed that the provisions of G. L. c. 151B "shall be construed liberally" for the accomplishment of the remedial purposes of the statute. G. L. c. 151B, § 9. Surely one aspect of that remedial purpose is to encourage impaired persons to overcome or mitigate their disabilities.[11] Advancements in medicine and the biological sciences, as well as rehabilitative technologies, now offer new hope to many individuals who previously may have been totally or significantly incapacitated by an impairment. The broad prohibition against the discrimination of qualified handicapped individuals contained in the 1980 amendment to the Massachusetts Constitu-

---

[10]Employees with diabetes, epilepsy, or heart disease, for example, may be able to control their impairments, but to do so, they may require an adjusted work schedule to take occasional time off from work to attend doctors' appointments, take medication, or receive therapy or testing.

[11]Determining "handicap" with reference to mitigating measures might produce anomalous results. The department's interpretation of G. L. c. 151B would protect an employee who cannot afford to buy medication to correct an impairment, but the same employee, once able to obtain treatment under his employer's health plan, would no longer be "handicapped" and could be lawfully fired based on his impairment. See *Arnold* v. *United Parcel Serv., Inc.,* 136 F.3d 854, 862 (1st Cir. 1998). Two individuals with the same hearing impairment might be treated differently under the statute because one can afford a hearing aid and one cannot.

tion[12] and the enactment three years later of legislation extending protection in employment to handicapped persons are recognition that persons who are physically or mentally impaired are nevertheless capable of becoming productive and successful members of the workforce. We construe G. L. c. 151B, § 4, to give the fullest effect to that recognition.

The department suggests that the interpretation we find persuasive is not compelled because a handicapped person, such as Dahill, who has availed himself of corrective measures may nevertheless seek protection from discrimination under the third prong of the definition of "handicap," as one who is "regarded as" having an "impairment that substantially limits one or more major life activities." The Legislature identified three avenues by which a person can establish that he falls within the statute's protection: the person (a) has an "impairment" that substantially limits a major life activity, (b) has a "record" of such impairment, or (c) is "regarded" as having such impairment. See note 6, *supra.* Loosely speaking, the first prong protects only those persons with actual physical or mental limitations, while the third prong protects those persons who, whether actually impaired or not, may be the victims of stereotypic assumptions, myths, and fears regarding such limitations. A plaintiff may prove that he is a handicapped person under one, two, or all of the three statutory definitions.[13] The question we are asked to answer is whether our antidiscrimination statute requires

[12]In 1980, the voters of Massachusetts ratified an amendment to the Constitution prohibiting all discrimination on the basis of handicap. See art. 114 of the Amendments to the Massachusetts Constitution. The ballot presented to the voters summarized the proposed amendment as follows: "The proposed amendment . . . would prohibit discrimination against handicapped people. It would provide that no otherwise qualified handicapped individual could, on the sole basis of that handicap, be excluded from participation in, denied the benefits of, or subjected to discrimination in any program or activity."

[13]The United States Supreme Court has taken a similar approach to the relationship of the three prongs of "disability" under the ADA. In *Sutton* v. *United Air Lines, Inc.*, 527 U.S. 471 (1999), the Court determined that a person is "regarded as" disabled under prong (C) of the definition if his employer believes "either that [the person] has a substantially limiting impairment that one does not have or that [the person] has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Id.* at 489. The Court reached the "regarded as" prong only after determining that the

"consideration of mitigating or corrective devices in determining whether a person has a handicap." It does not, regardless of whether a plaintiff can prevail under the first prong of the definition, as well as under the third.

We return to the holding of the Supreme Court in *Sutton* v. *United Air Lines, Inc.*, 527 U.S. 471 (1999). There are sound reasons why our interpretation of the Massachusetts statute diverges from the Court's interpretation of similar language in the Federal statute. First, the Supreme Court attributed little weight to guidelines issued by the Equal Employment Opportunity Commission (EEOC) that "the determination of whether an individual is substantially limited in a major life activity [should] be made *without regard* to mitigating measures [under the ADA]" (emphasis added). *Sutton* v. *United Air Lines, Inc.*, *supra* at 481, citing 29 C.F.R. Part. 1630, App. at 1630.2(j) (1998). Because Congress has not granted to the EEOC the authority to issue regulations interpreting or implementing the generally applicable provisions of the ADA, including the statutory definition of "disability," the Court said that it had no need to decide what deference the regulations were due. *Sutton* v. *United Air Lines, Inc.*, *supra* at 479-480.[14] In contrast, as we have explained, the General Court has expressly authorized the MCAD to interpret and implement the provisions of the Massachusetts antidiscrimination statute.

Second, in the preamble to the Federal legislation, Congress had estimated that forty-three million Americans have disabilities. See *id.* at 484-485. This number would have been far larger, the Supreme Court reasoned, if Congress had intended the ADA to cover people with "corrected physical limitations." See *id.* at 487. The Massachusetts statute, in contrast, contains no such estimate of the number of people in the Commonwealth

---

plaintiffs were not "disabled" under the first prong; the three prongs of the definition are to be assessed independently. One commentator has noted that "[i]n practice . . . the narrow understanding of disability that excludes mitigated conditions under the first prong will often also exclude them under the third prong." Parmet, Plain Meaning and Mitigating Measures: Judicial Interpretations of the Meaning of Disability, 21 Berkeley J. Employment & Lab. L. 53, 63 (2000).

[14]The Supreme Court, in fact, held that "the approach adopted by the agency guidelines . . . is an impermissible interpretation of the ADA." *Sutton* v. *United Air Lines, Inc.*, *supra* at 482.

with handicaps, nor does it contain any analogous provision suggesting that the Legislature intended to exclude from coverage the many persons with significant, but correctable, impairments. While Federal precedents can be "most helpful" in the resolution of cases involving G. L. c. 151B, *Cox* v. *New England Tel. & Tel. Co.*, 414 Mass. 375, 384 (1993), because the Massachusetts nondiscrimination statute differs from the ADA in at least the two critical respects we have discussed, it is not appropriate to follow the Federal jurisprudence in this case.[15]

We are not persuaded that our decision today will open the floodgates of litigation, as the department fears. Our interpretation of G. L. c. 151B, § 1 (17), heralds no change in Massachusetts jurisprudence: since 1983, when the Legislature made the relevant amendment to G. L. c. 151B, judges and litigants in Massachusetts have assumed that a person with a significant physical or mental impairment met the threshold definition of "handicap," whether the person used corrective devices or took other mitigating measures. See, e.g., *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813 (1997) (no discussion of mitigation); *Wooster* v. *Abdow Corp.*, 46 Mass. App. Ct. 665, 667 (1999) (controlled asthma); *Handrahan* v. *Red Roof Inns, Inc.*, 43 Mass. App. Ct. 13, 15-16 (1997) (controlled epilepsy).

Additionally, the determination whether Dahill has a "handicap" is a threshold inquiry under G. L. c. 151B: does he fall within the class of persons the Legislature sought to protect? If he meets that threshold test, he must still prove that he can perform the essential functions of a police officer, with or without reasonable accommodations. See *Cox* v. *New England Tel. & Tel. Co.*, *supra* at 383. Reasonable accommodation by the department to his handicap need only be made if it would impose no "undue hardship" on the employer. G. L. c. 151B, § 4 (16). Dahill must also demonstrate that his handicap was the cause of the department's allegedly unlawful discrimination. See *Labonte* v. *Hutchins & Wheeler*, *supra* at 821. These legislative criteria constrain any possibility that recovery for Dahill

---

[15]To our knowledge, since the decision in *Sutton* v. *United Air Lines, Inc.*, *supra*, no State court of last resort has considered the question certified to us.

will be automatic.[16] See *Arnold* v. *United Parcel Serv., Inc.,* 136 F.3d 854, 861 (1st Cir. 1998) (under analogous Federal provisions, even with earlier "broad view" of disability, concerns and interests of employers are still "amply protected").

We answer the certified question, "No."

The Reporter of Decisions is to furnish attested copies of this opinion to the clerk of this court. The clerk in turn will transmit one copy, under seal of this court, to the clerk of the United States District Court for the District of Massachusetts, as answer to the question certified, and will also transmit a copy to each party.

---

[16]The American Bar Association has determined that between 1992 and 1997, prior to the decision in *Sutton* v. *United Air Lines, Inc., supra,* employers prevailed in 91.6% of cases brought under the ADA. See MacLachlan, Employers Winning ADA Suits, 22 Nat'l L.J. B1, B3 (2000).