Giles, J.
Introduction
The plaintiff, Robert Lie, also known as Allie Lie[1] (“plaintiff”), a male-to-female transsexual, alleges unlawful discrimination based upon sex, sexual orientation, and handicap by the defendant, Sky Publishing Corporation (“defendant”), as well as illegal retaliation, all in contravention of General Laws Chapter 151B. This matter is before the court on the defendant’s motion for summary judgment as to all counts. The ' defendant asserts that the plaintiff has failed to state a cognizable claim under G.L.c. 15IB, that there are no material issues of fact in dispute, and that it is entitled to entry of judgment as a matter of law. The plaintiff opposes the motion. For the reasons discussed below, the defendant’s motion for summary judgment is ALLOWED IN PART and DENIED IN PART.
Background
Beginning in December 1994, the plaintiff was employed by the defendant as an editorial assistant. In May of 1998, the plaintiff, who is biologically male, began to wear traditionally female attire to work. On June 16, 1998, the defendant’s management personnel met with the plaintiff to request that she only wear traditionally male attire while at work. At that time, the defendant emphasized that it had no desire to terminate her but, instead, wanted her compliance with what it perceived to be reasonable business policy. The plaintiff continued to wear traditionally female clothing, however.
Throughout its papers, the defendant refers to the plaintiff as a “cross-dresser” or “transvestite,” whereas she refers to herself as a “transgendered individual” or “transsexual.” As this distinction goes to the heart of at least one of the counts of the complaint, it is worth taking a moment to clarify the point.
Even though “transsexual” and “transgendered individual” are often used as interchangeable labels in everyday parlance, “transgendered individual” is also a distinct umbrella term used to describe all individuals who exhibit a gender identify that does not conform to societal expectations, including transsexuals, transvestites, and others who engage in a gender expression that is different from that associated with their biological sex. See generally Holt, Reevaluating Holloway: Title VII Equal Protection and the Evolution of a Transgender Jurisprudence, 70 Temp.L.Rev. 283, 290 (1997). A transsexual is a person whose gonads (testicles or ovaries), chromosomes (two X chromosomes or an X and a Y chromosome), and physique mark him or her as a member of one sex but who, in spite of this, is emotionally and mentally uncomfortable being of that sex and, as such, wants to become a member of the other sex. J. Schmidt, M.D., Attorney’s Dictionary of Medicine, T-204 (Matthew Bender & Co. 2001). The term “transsexual," therefore, specifically refers to those individuals who could be diagnosed as having a gender identity disorder (Diagnostic Code 302.85 when referring to adolescents or adults) under the rubric provided by the psychiatric community:
Adults with Gender Identity Disorder are preoccupied with their wish to live as members of the other sex. This preoccupation may be manifested as an intense desire to adopt the social role of the other sex or to acquire the physical appearance of the *413 other sex through hormonal or surgical manipulation. Adults with this disorder are uncomfortable being regarded by others as, or functioning in society as, a member of their designated sex. To varying degrees, they adopt the behavior, dress, and mannerisms of the other sex. In private, these individual may spend much time cross-dressed and working on the appearance of being the other sex. Many attempt to pass in public as the other sex.
American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders-Fourth Edition (“DSM-IV”) 533 (1994).[2] By contrast, a transvestite or “cross-dresser” is simply a man or woman who wears clothing normally worn by members of the opposite sex. Schmidt at T-212.
The plaintiff avers that she is a biological male who has desired to live as a woman for a number of years, that she has been diagnosed with gender identity disorder, that she engages in psychotherapy, and that she takes hormones as part of her treatment. At no point has the defendant disputed any of these claims. Consequently, the plaintiff has alleged sufficient facts to establish she is a transsexual, not simply a man who prefers traditionally female attire.
On June 19, 1998, the plaintiff filed a charge of discrimination with the Cambridge Human Rights Commission (“Commission”), alleging that she was being discriminated against due to her transgender status. On June 29, 1998, the defendant requested in writing that the plaintiff refrain from “dressing as a woman” and advised her that “failure to conform your attire may result in disciplinary action and/or termination.” The plaintiff responded on June 30, 1998, informing the defendant that she had been diagnosed with “gender dysphoria” (otherwise known as gender identity disorder) and, therefore, that she intended to continue to dress in a manner consistent with traditionally female attire.
The Commission’s finding of probable cause issued on July 9, 1998; and the defendant received a copy of the Commission’s decision. On July 15, 1998, the plaintiff filed a charge of discrimination on the basis of sex with the Massachusetts Commission Against Discrimination (“MCAD”) regarding the terms and conditions of her employment with the defendant.
On July 24, 1998, the defendant terminated the plaintiffs employment. The reason for this termination is in dispute. The defendant claims the termination was unrelated to their previous discussions regarding office attire and, in fact, was a response to the plaintiffs violation of the company e-mail policy and exhibition of hostility and aggression in the workplace. (On July 17, 1998, the plaintiff had sent an. e-mail to two of her superiors, advising them of the need to leave work for a period of time. In this communication, she had included language that her supervisors deemed hostile, disrespectful, inappropriate, insubordinate, and offensive and an improper use of the e-mail system.) In turn, the plaintiff claims her termination was based upon discriminatory animus against her, due to her status as a transsexual, and retaliation, as a result of her filing of complaints with the Commission and the MCAD.
On July 27, 1998, the plaintiff filed additional charges with both the Commission and the MCAD alleging her retaliation claims. On December 18,1998, she filed a final charge with the MCAD, specifically maintaining that her termination from the defendant in and of itself constituted discrimination on the basis of sex, gender, sexual preference, perceived sexual preference, disability, and perceived disability. In March of 1999, the MCAD ordered that the charges be consolidated under the original July 15, 1998 complaint.
The plaintiff has since withdrawn her charges from the MCAD and filed a complaint with this court on July 20,2001.
Discussion
Motions for summary judgment are governed by Mass.R.Civ.P. 56(c). Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
I. Discrimination on the Basis of Sex in Violation of G.L.c. 15 IB (Count I)
General Laws Chapter 151B, §4, in relevant part, makes it illegal for an employer to discriminate against an individual in terms, conditions, or privileges of employment or to discharge an individual from employment because of the individual’s sex, unless based upon a bonafide occupational qualification. Sex is not defined. Whether or not this prohibition applies to discrimination on the basis of transsexual status is a matter of first impression in the Massachusetts courts, although the MCAD recently considered the matter. See Millet v. Lutco, 23 M.D.L.R. 231 (2001) (MCAD Docket No. 98 BEM 3695) (full commission decision finding that discrimination based on transsexual status was actionable under Chapter 15 IB as sex discrimination). Because sex is not defined in the *414 statutory framework of Chapter 15 IB, the court looks to caselaw, both in Massachusetts and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a)(1), the equivalent federal civil rights legislation, for guidance in applying the law to the instant case. See Dahill v. Police Department of Boston, 434 Mass. 233 (2001).
In Price Waterhouse, the United States Supreme Court held that an employer commits actionable discrimination under Title VII when it relies upon stereotypical thinking about the employee based on sex. In a promotion review in an accounting firm, one partner “described [the plaintiff in Price Waterhouse] as ‘macho’; another suggested that she ‘overcompensated for being a woman’; and a third advised her to take ‘a course at charm school.’ ” Price Waterhouse v. Hopkins, 490 U.S. 228, 235 (1989). Furthermore, the partner who informed the plaintiff of the decision not to promote her advised her to “walk more femininely, wear make-up, have her hair styled, and wear jewelry.” Id. All of the Title VF cases cited by the defendant in its motion for summary judgment were decided before this watershed case, which established a new federal standard for disparate treatment sex discrimination claims. The only Massachusetts case cited, Macauley v. Massachusetts Comm’n Against Discrimination, is similarly impaired and is relevant only to the plaintiffs claim of sexual orientation discrimination under Count III. 379 Mass. 279 (1979) (holding that “sexual preference” is not within the traditional meaning of sex encompassed by the statute).
One recent interpretation of Title VII on issues of gender non-conformity is Schwenk v. Hartford, in which the Ninth Circuit relied on Price Waterhouse to repudiate a previous ruling that had denied the application of Title VII to a transgendered woman. 204 F.3d 1187 (9th Cir. 2000) (holding that the definition of “sex” under federal non-discrimination laws encompasses both biological differences between men and women as well as actions based on failure to conform to socially-prescribed gender expectations). Not all of the federal circuits have similarly reversed decisions arrived at before Price Waterhouse, but this court finds the Ninth Circuit’s application persuasive.
The First Circuit Court of Appeals has weighed in on the matter, holding that a biological man who was denied a loan application because he was dressed in traditionally female clothing had established a prima facie case of sex discrimination under the Equal Credit Opportunity Act (“ECOA”) sufficient to avoid a motion to dismiss. Rosa v. Park West Bank & Trust, 214 F.3d 213 (2000). The ECOA is interpreted with reference to Title VII employment discrimination jurisprudence. Id. at 215 (citing Mercado-Garcia v. Ponce Fed. Bank, 979 F.2d 890, 893 (1st Cir. 1992)). In Rosa the court considered the viability of proving sex discrimination under these circumstances:
It is reasonable to infer that [the Defendant] told [the Plaintiff] to go home and change because she thought that [the Plaintiffs] attire did not accord with his male gender: in other words, that [the Plaintiff] did not receive the loan application because he was a man, whereas a similarly situated woman would have received the loan application.
Id. The court concluded that such an allegation supported a claim of disparate treatment sex discrimination, citing extensive authority. See International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977) (“ ‘Disparate treatment’ ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their . . . sex”); Gerdon v. Continental Airlines, Inc., 692 F.2d 602, 610 (9th Cir. 1982) (en banc) (invalidating airline’s policy of weight limitations for female “flight hostesses” but not for similarly situated male “directors of passenger services” as impermissible disparate treatment); Carroll v. Talman Fed. Sav. & Loan Assoc., 604 F.2d 1028 (7th Cir. 1979) (invalidating policy that female employees wear uniforms but that similarly situated male employees need wear only business dress is impermissible disparate treatment); Allen v. Lovejoy, 553 F.2d 522, 524 (6th Cir. 1977) (invalidating rule requiring the abandonment upon marriage of surname that was applied to women but not to men). Although the court is not bound by these other jurisdictions’ interpretations of their statutes, the court finds this line of reasoning significantly more persuasive than the interpretations found in other federal circuits and relied upon by the defendant in this case.
When addressing this issue as one of first impression for the agency, the MCAD offered a New Jersey court’s forceful reflection regarding the application of that state’s sex discrimination laws to discrimination against transsexuals:
It is incomprehensible to us that our Legislature would ban discrimination against heterosexual men and women; against homosexual men and women; against bisexual men and women; against men and women who are perceived, presumed, or identified by others as not conforming to the stereotypical notions of how men and women behave, but would condone discrimination against men or women who seek to change their anatomical sex because they suffer from a gender identify disorder. We conclude that sex discrimination under the [state’s anti-discrimination statute] includes gender discrimination so as to protect plaintiff from gender stereotyping and discrimination for transforming herself from a man to a woman.
Millett, citing Enriquez v. West Jersey Health Sys., 342 N.J.Super. 501, 515 (2001). In light of Massachusetts’ history of interpreting expansively remedial civil rights legislation, this court agrees. G.L.c. 151B, §9 (instructing the courts to construe the provisions of c. *415 15 IB “liberally for the accomplishment of the purposes” of the legislation).
In the case at bar, the plaintiff has alleged that she was discriminated against because she was born biologically male. Had she been born biologically female, the defendant would not have demanded she wear traditionally male attire and would not have fired her for failing to do so, as she alleges. The plaintiff contends that the defendant’s conduct was based on stereoiyped notions of “appropriate” male and female behavior in the same manner as the conduct of the defendant in Price Waterhouse. Accordingly, the Plaintiff has set forth a prima facie case of sex discrimination under Chapter 151B sufficient to survive summary j udgment.
II. Discrimination on the Basis of Handicap in Violation of G.L.c. 151B (Count H)
General Laws Chapter 151B, §§1(16-20) and 4(16), in pertinent part, make it illegal for an employer to discriminate against an individual in terms, conditions, or privileges of employment or to discharge an individual because of his or her handicap if the individual claims to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation.
A. Statutory History
The language extending protection from unlawful employment discrimination to people with handicaps under Chapter 151B was first enacted in 1983. St. 1983, c. 533, §2. In doing so, the legislature explicitly patterned the definition of handicap on that found in the Federal Rehabilitation Act (“FRA”) of 1973, 29 U.S.C. §706. See Talbert Trading Co. v. Massachusetts Comm’n Against Discrimination, 37 Mass.App.Ct. 56, 60 (1994). Under the original FRA, at least two federal courts refused to dismiss claims brought by individuals claiming gender nonconformity, concluding that the plaintiffs had stated a claim under the FRA., either because the gender nonconformity was a physical or mental impairment that substantially limited their ability to function or because they were regarded as having such an impairment. See Blackwell v. U.S. Dep’t of Treasury, 830 F.2d 1183 (D.C.Cir. 1987) (recognizing an employment discrimination claim based on the handicap of transvestism as covered by the FRA); Doe v. United States Postal Service, 37 F.E.P. Cases 1867, 1985 WL 9446 (D.C.Cir. 1985) (recognizing an employment discrimination claim under the FRA on the basis of transexualism).
In enacting the Americans with Disabilities Act (“ADA”) in 1990, Congress explicitly excluded from the protection of the statute individuals with “gender identity disorders not resulting from physical impairments.” 42 U.S.C. § 12208. At the same time, Congress amended the FRA to include the same exclusion. 29 U.S.C. §706(8) (F)(i). Massachusetts has never enacted such an exclusionary amendment to Chapter 15 IB.
The defendant urges this court to weigh heavily the fact that the FRA in its current form and the ADA since its inception seemingly would bar a claim for protection from discrimination based on transexualism.[3] The court finds more compelling the fact that this state’s legislature has never seen fit to make a similar amendment. Though federal civil rights jurisprudence is often instructive in the court’s interpretations of Chapter 15 IB, this Commonwealth is certainly not bound to follow wherever Washington leads. See Dartt v. Browning-Ferris Industries, Inc., 427 Mass. 1, 9-10 n.13 (1998) (“While we do on occasion consider judicial interpretations of Federal civil rights statutes instructive in our analyses of G.L.c. 151B, we have not always done so”); Labonte v. Hutchins & Wheeler, 424 Mass. 813, 816 n.5 (1997).
B. Qualified Person with a Handicap
A qualified handicapped person under Chapter 151B,§§1(16-20) and 4(16) is a handicapped person who is capable of performing the essential functions of the position involved or who would be capable of doing so with reasonable accommodation to the handicap. Handicap under this statutory scheme has three manifestations: 1) a physical or mental impairment which substantially limits one or more major life activities of a person, 2) a record of having such an impairment, or 3) being regarded as having such an impairment. Major life activities include, but are not limited to, caring for one’s self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. The application of Chapter 15 IB, §4(16) to transexualism is a case of first impression for the Massachusetts courts, which previously have dealt with the issue only in dicta. The MCAD, however, has considered the matter directly. See LaFleur v. Bird-Johnson Co., 3 Mass. L. Rptr. 196 (Norfolk Sup.Ct. 1994) (dismissing the matter on procedural grounds before moving on to consider hypothetically transexualism and transvestism as disabilities under c. 15 IB); Jette v. Honey Farms Mini Market, 23 M.D.L.R. 229 (2001) (MCAD Docket No. 95 SEM 0421) (full commission decision holding transexualism is a protected handicap under c. 151B).
As discussed above, gender identity disorder, which is listed as a disorder in the diagnostic manual of the American Psychiatric Association, arguably is a physical or mental impairment. DSM-IV at 533 et seq. The plaintiff alleges that this impairment in its unmitigated form substantially limits the major life activities of working, relating to others, and caring for herself. This contention is supported by the DSM-IV, which states that, in adolescents and adults with gender identity disorder, “pre-occupation with cross-gender wishes often interferes with ordinary activities. Relationship difficulties are common and functioning at school or work may be impaired.” Id. at 534. The court must look to the plaintiffs unmitigated condition when determining if she is a “handicapped person,” *416 not how the plaintiff is able to function when receiving proper treatment and accommodations. See Dahill at 236-44. Even putting aside the diagnosis of gender identity disorder, the need for ongoing medical care in the form of psychotherapy and hormone treatments may qualify as a substantial limitation on its own. Finally, whether an individual’s gender identity is characterized as psychological, neurological, or endocrinological, it is certainly a health condition for some transsexuals.
Furthermore, the plaintiff alleges that she is also protected from discrimination under the third prong of the statute’s definition of handicap in that she alleges the defendant regarded her as having a handicap rendering her incapable of performing her job, despite her abilities and capacity. The Supreme Judicial Court has made clear that the public policies underlying Chapter 15IB, §4(16) are designed to protect otherwise qualified individuals whose only impairment in major life activities stems from “deprivations based on prejudices, stereotypes, or unfounded fear . . .” Cox v. New England Tel. & Tel. Co., 414 Mass 375, 383-84 (1993), quoting School Bd. of Nassau County v. Arline, 480 U.S. 273, 287 (1987). It cannot be gainsaid that transsexuals have a classically stigmatizing condition that sometimes elicits reactions based solely on prejudices, stereotypes, or unfounded fear. Thus, the plaintiff has established a prima facie case of discrimination on the basis of handicap.
C. Undue Burden Defense
Under Chapter 151B, §4(16), the employer is excused from compliance with this section if it can demonstrate that the accommodation required to be made to the physical or mental limitations of the person with a handicap would impose an undue hardship on the employer’s business. In determining whether an undue hardship exists, the court must look to 1) the overall size of the employer’s business as regards the number of employees, number, and type of facilities, and size of the budget or available assets; 2) the type of business, including the composition and structure of the workforce; and 3) the nature and cost of the accommodation needed. The requested accommodation in this case would be allowing the plaintiff to work while dressed in clothing not traditionally associated with her biological sex. It is a matter of disputed material fact as to whether such an accommodation would have been an undue burden. For these reasons, the defendant is not entitled to summary judgment on Count II.
HI. Discrimination on Basis of Sexual Orientation in Violation of G.L.c. 15 IB (Count III)
General Laws Chapter 15 IB, §4(1), in relevant part, makes it illegal for an employer to discriminate against an individual in terms, conditions, or privileges of employment or to discharge an individual from employment because of the individual’s sexual orientation, unless based upon a bona fide occupational qualification. Under §3(6), sexual orientation is defined as having an orientation for or, alternatively, being identified as having an orientation for heterosexuality, bisexuality, or homosexuality. Whether or not sexual orientation under Chapter 15 IB encompasses transexualism is a matter of first impression for the Massachusetts courts, although the MCAD has considered the issue. See Millet (full commission holding finding that transexualism is not a sexual orientation, noting in dicta, however, that it might be protected if the employer regarded it as such and discriminated on that basis).
As previously discussed, transexualism is best understood as an issue of gender identity unrelated to sexual orientation. A psychiatric diagnosis of gender identity disorder is independent of an individual having a heterosexual, bisexual, or homosexual orientation. DSM-IV at 534, 538; A.D.A.M., Health Illustrated Encyclopedia, National Library of Medicine, available at http://www.nlm.nih.gov/medlineplus/ency/article/001527.htm (last visited on Oct. 1, 2002). As a matter of law, a simple claim of discrimination due to one’s status as a transsexual does not give rise to a claim of discrimination on the basis of actual sexual orientation. They are unrelated.
The court nevertheless recognizes that those who transgress traditional gender roles and defy stereotypes associated with their biological sex are less likely to be perceived as heterosexual than the general population. See Millet at n.3. The conflation of one’s appearance with one’s sexual orientation in this fashion may lead to discrimination actionable under the. second prong of Chapter 15IB’s definition of sexual orientation discrimination, that is, discrimination due to being identified as having an orientation for heterosexuality, bisexuality, or homosexuality, regardless of the person’s actual orientation. See, e.g., Rosa at 214 (“It is . . . reasonable to infer . . . that [the teller] refused to give [the plaintiff] the loan application because she thought he was gay, confusing sexual orientation with cross-dressing”).
The plaintiff neither makes a claim regarding her sexual orientation nor presents sufficient facts in her complaint to support a claim that the defendant’s actions were motivated in any way by her actual or perceived orientation. Moreover, she does not aver that the defendant confused her transsexual status with a sexual orientation, homosexual or otherwise. Therefore, judgment for the defendant on Count HI is warranted.
IV. Illegal Retaliation in Violation of G.L.c. 15 IB (Count IV)
Chapter 151B, §4(4) provides that it is unlawful practice for any employer to discharge, expel, or otherwise discriminate against any person because he/she has opposed any practices forbidden under Chapter 151B or because he/she has filed a com *417 plaint, testified, or assisted in any proceeding with the MCAD. It is not required that the plaintiff succeed in her underlying claim of discrimination to be protected from retaliation, but merely that she reasonably believed such discrimination was occurring. Tate v. Department of Mental Health, 419 Mass. 356 (1995) (setting out the standard for retaliation claims under c. 151B).
At the hearing on this motion, the defendant acknowledged that it was aware of the plaintiffs complaint with the Commission at the time it discharged her. Knowledge of the filing with the Commission creates an issue of material fact for the jury as to whether the plaintiffs termination was an act of retaliation based upon that knowledge. Because there are material facts in dispute, summary judgment on Count IV is inappropriate.
ORDER
For all the foregoing reasons, it is hereby ORDERED AND ADJUDGED that the defendant’s motion for summary judgment be ALLOWED as to Count III and, further, that it be DENIED as to Counts I, II, and IV.

The plaintiff has a female gender identify and prefers to be referred to as a female. The court will respect that preference and refer to the plaintiff accordingly.

This definition specifically is meant to exclude those who, biologically, have markers for both sexes due to congenital conditions (i.e., intersexed individuals). DSM-IV at 537. Though many analogies can be made between the experiences of transsexuals and intersexed individuals, their situations are fundamentally distinct; a priori, this decision does not address the application of Chapter 15 IB to intersexed individuals.

Since the federal laws do not exclude gender identity disorders which can be shown to result from physical impairments and the potential organic origin of transexualism is unknown, it is possible that if a genetic link were found, transexualism would once again be covered by the act as a “physical impairment.”