Gants, J.
The plaintiff, Paul Shedlock (“Shedlock”), has filed this action alleging that, as a prisoner at MCI Norfolk, the defendant Department of Correction (“DOC”) and the individual defendants discriminated against him on the basis of his physical handicap and then retaliated against him for the complaints he made about this discrimination. Both Shedlock and the defendants have moved for summary judgment as to all claims. After hearing and for the reasons stated below, the defendants’ motion for summary judgment is ALLOWED and Shedlock’s motion for summary judgment is DENIED.
BACKGROUND
In evaluating a motion for summary judgment, I must rely on facts not in dispute as well as disputed facts viewed in the light most favorable to the nonmoving party. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995). Although both Shedlock and the defendants have moved for summary judgment, the facts stated below are presented in the light most favorable to Shedlock and should not be misunderstood as findings of the Court.
At all times relevant to his Second Amended Complaint, Shedlock was a prisoner in the custody of DOC, housed at MCI-Norfolk. Before his incarceration, in November 1984, Shedlock was in a serious motor vehicle accident in which one person was killed and he suffered fractures of the hip, right ankle, skull, and both eye orbits, herniated a disc, and ruptured his spleen. Metal plates were inserted in his lower right leg and face. When he arrived at MCI-Norfolk, he was diagnosed at the Intake and Administrative Classification Review with a herniated disc. The defendants observed that, at MCI-Norfolk, he walked with a cane and had a slight limp. No inmate is permitted to use a cane, in view of its potential use as a weapon, without medical approval.
On December 23, 1997, Shedlock was transferred from a second-floor cell in unit 8-1 to another second-floor cell in unit 8-2. However, when defendant Sgt. Michael Hamm (“Sgt. Hamm”) attempted to move him to his new cell, Shedlock refused the new housing assignment, stating that he needed a first-floor cell because he could not climb stairs. Sgt. Hamm told him that “we don’t fucking cater to cripples around here.” Shedlock refused to move from his cell, and sat down at a table in the common area. Sgt. Hamm went into the office of defendant Sgt. Pete Wilson (“Sgt. Wilson”), and both Sgt. Hamm and Sgt. Wilson later came to speak with Shedlock. Sgt. Wilson asked him what his problem was, and Shedlock told him of his disability and his request for a housing assignment on the first floor. Sgt. Wilson told him either to go to his second-floor cell or to the “RB,” the disciplinary segregation unit. When he refused to go to his second-floor cell, Shedlock was issued a disciplinary report and sent to the RB. Shedlock at that time did not have a medical order for a first-floor cell, but DOC did not require a medical order to transfer an inmate to a first-floor cell. The Superintendent of MCI-Norfolk, in deciding whether to make this special accommodation, certainly could have conferred with the medical unit but the accommodation could have been made without the issuance of a medical order.
A disciplinary hearing was held on January 13, 1998 before defendant Sgt. Anthony Parks (“Sgt. *359 Parks”), who found Shedlock guilty of disobeying an order and disrupting the orderly running of the institution. He was ordered to serve five days in disciplinary segregation (which he had already served) and suffered a loss of telephone privileges for thirty days. Sgt. Parks told Shedlock to leave the guilty finding alone, and added that, if he did not leave it alone, “your stay here is going to be bad.” Shedlock appealed the disciplinary finding to defendant Timothy Hall, the Superintendent of MCI-Norfolk, who denied Shedlock’s appeal on February 2, 1998 on the sole ground that Shedlock at the time did not have a medical order that required him to be housed on the first floor.
OnFebruary4, 1998, Shedlock was issued a special needs medical order that directed that he be housed indefinitely in a first-floor cell because of his “chronic lower back pain and arthritis in his ankle,” which caused him difficulty in climbing stairs. As a result of that medical order, he was housed in a first-floor cell. However, the next day, on February 5, 1998, Sgt. Hamm directed him to move to a second-floor cell. Shedlock told him that he had a medical order to be on the first floor. Sgt. Hamm went to the office of Sgt.Wilson to confer with him. Sgt. Wilson later came out of the office and asked Shedlock what his problem was. Shedlock told him that he had a medical order to be housed on the first floor. Sgt. Wilson said he did not care about that, and that Shedlock was either going upstairs or to the RB. This time, Shedlock went upstairs to the second-floor cell.
Shedlock remained in a second-floor cell until June 3, 1998, when he was moved to a third floor cell. While on the second floor, Shedlock informed the Unit Manager, defendant Captain James Krantz, about his disability, but Krantz said he would not interfere with Sgt. Wilson’s decisions regarding cell assignments.
On July 15, 1998, Shedlock filed his complaint in this action. The next dayJuly 16, 1998he was moved to a first-floor cell, and he continues to reside in a first-floor cell at MCI-Norfolk.
OnFebruaiy 12,1999, Shedlock requested and was issued a special needs medical order for a stand-up locker because of his “(1) multiple skeletal and joint injuries and disabilities, [and] (2) degenerative joint disease in ankles.” On March 9, 1999, Captain Krantz asked Shedlock why he had received a medical order for a stand-up locker rather than the new, under-the-bed lockers that were being installed. Shedlock explained that the medical order was consistent with his physical condition, which did not permit him continually to access the under-the-bed lockers over time without adversely affecting his physical condition. Captain Krantz told him that he could not hold up renovations because Shedlock needed a stand-up locker, and that Shedlock would probably be moved to many different cells before he ultimately ended up in a handicap cell on the first floor.
In a letter to the Commissioner of Corrections dated March 9, 1999, Shedlock described this conversation with Captain Krantz and requesting that DOC honor his rights as a handicapped inmate under the Americans with Disabilities Act, 42 U.S.C. §12101 (“ADA"). He specifically declared that he should not be denied the same benefits of housing, work, or program participation as other inmates because of his handicap, and should not suffer retaliation for his complaints. On March 30, 1999, DOC’s Assistant Deputy Commissioner wrote Shedlock regarding his letter. He said that Supt. Hall had spoken to Captain Krantz about these issues, and that MCI-Norfolk was “trying to make reasonable accommodations for you during the ongoing renovations, and this may require you moving to another unit.”
Supt. Hall spoke to the health services administrator about Shedlock’s medical order for a stand-up locker and, as a result of this conversation, Dr. Arthur Brewer reviewed this medical order. Dr. Brewer did not conduct any medical examination of Shedlock. Rather, on January 7, 2000, Dr. Brewer simply went to Shedlock’s cell, discovered that Shedlock was storing some items in the under-the-bed locker, and, on that basis alone, rescinded the special needs medical order for a stand-up locker.
In his Second Amended Complaint, Shedlock essentially presents three claims:
1. That the defendants discriminated against him on the basis of his disability by not providing him with a first-floor cell, in violation of the federal ADA, 28 U.S.C. §12132, the federal Rehabilitation Act, 29 U.S.C. §794, and Article 114 of the Massachusetts Constitution. He also contends that the defendants have violated these federal and state laws by not making readily accessible to him other facilities, such as the law library, classrooms, and the gym, which are located on other floors and accessible only by the use of stairs.
2. That the defendants engaged in unlawful retaliation against him in violation of the ADA by (1) reassigning him from his first-floor cell to cells on the second and third floor because he appealed Sgt. Park’s disciplinary decision: and (2) causing a review of his medical order for a stand-up locker, which resulted in that medical order being rescinded, because he had brought the instant complaint alleging handicap discrimination.
3. That Sgt. Wilson deprived him of his civil rights by means of threats, intimidation, and coercion on December 23, 1997 when he filed a disciplinary report against Shedlock for exercising his right to a reasonable accommodation for his disability, in violation of G.L.c. 11, §12. He also alleges that Sgt. Parks deprived him of his civil rights by means of threats, intimidation, and coercion by threatening to make his prison stay “bad” if he were to appeal the guilty finding at his disciplinary hearing.
*360 This Court will consider each claim in turn.
DISCUSSION
The Discrimination Claim
In order to prevail on his claim that the defendants have discriminated against him on the basis of his disability or handicap in violation of either the ADA, the Rehabilitation Act, or Article 114, Shedlock must first establish that he has a “disability” or “handicap,” as defined under these separate laws, and therefore falls within the protection of these laws. Since Shedlock seeks relief under three separate statutes (two federal and one state), this Court must examine separately whether he falls within the protection of each.
A. The ADA
Under the ADA, “no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, orbe subjected to discrimination by any entity.” 42 U.S.C. §12132. “The term ‘disability’ means, with respect to an individual:
(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment."
42 U.S.C. §12102(2). Walking is recognized as one of the major life activities. Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 122 S.Ct. 681, 690 (2002). See also 45 C.F.R. §84.3(j)(2)(ii) (2001). Therefore, the issue before this Court is whether, viewing the evidence in the light most favorable to Shedlock, he could reasonably be found to have a physical impairment arising from the injuries he sustained in his car accident that “substantially limits” his ability to walk. In considering this question, this Court must take into account the corrective or mitigating measures that Shedlock has taken to cope with his physical impairment. Sutton v. United Air Lines, Inc., 527 U.S. 471, 482 (1999). Here, that means that this Court must determine whether his physical impairment “substantially limits” his ability to walk even when he uses his cane.
In Toyota Motor Mfg., Ky., Inc. v. Williams, the Supreme Court recently declared, “[Substantially in the phrase ‘substantially limits’ suggests considerable or to a large degree.” 534 U.S. at _, 122 S.Ct. at 691. The Court added, “The word ‘substantial’ thus clearly precludes impairments that interfere in only a minor way with the performance of [a major life activity] from qualifying as disabilities.” Id. The Court concluded, “We therefore hold that to be substantially limited in performing [a major life activity], an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people’s daily lives.” Id. Consequently, to meet the definition of a person with a “disability,” Shedlock must establish that, with his cane, his impairment “prevents or severely restricts” him from walking.
The evidence, even viewed in the most generous light to Shedlock, cannot support that finding. In his deposition, Shedlock stated that, on an average day at MCI-Norfolk, he tries “to get out and walk for an hour.” Shedlock deposition at 51. He sometimes walks for two hours. Id. at 55. Twice a day, he stands in line at the health unit for between 20 and 40 minutes to receive his sinus medication. Id. at 54. He climbs down stairs to obtain the cleaning supplies he needs to clean his cell, id. at 55, and climbs up stairs three times each week to attend computer classes. Id. at 56. While the evidence supports the inference that Shedlock walks with a limp and that there is at least one building at MCI-Norfolk with more stairs than he “can deal with,” id. at 57, it simply cannot reasonably be said that his impairment “prevents or severely restricts” him from walking. See Nedder v. Rivier College, 908 F.Sup. 66, 76-77 (D.N.H. 1995) (“an inability to walk at a brisk pace for extended periods does not constitute a significant limitation in the major life activity of walking”); Stone v. Energy Servs., Inc., C.A. 94-2669, 1995 WL 368473 at *4 (E.D.La. June 20, 1995) (concluding that “although plaintiff cannot walk briskly, and has some trouble climbing stairs,” his “ability to walk is not substantially limited nor significantly restricted”).
Shedlock contends that, by denying the defendants’ motion to dismiss, Judge Thayer Fremont-Smith found that Shedlock had a disability under the ADA, and his finding effectively constitutes the law of the case. It is certainly true that Judge Fremont-Smith, in denying the motion to dismiss, declared, “In so far as the plaintiff avers in his complaint that he suffers from sciatica, arthritis, ankle and back pain, which severely impact his ability to ascend and descend stairs, he has sufficiently alleged a disability under the ADA.” Memorandum of Decision and Order on Defendants’ Motion to Dismiss or Motion for Summary Judgment, 10 Mass. L. Rptr. 19, 1999 Mass. Super LEXIS 118 *13 (March 23, 1999). This finding, however, does not become the law of the case for two independent reasons. First, Judge Fremont-Smith was focusing on the allegations in the complaint and determining their legal sufficiency. His decision simply considered whether the facts alleged, generously construed in favor of the plaintiff, stated a valid legal claim that would warrant relief on any theory of law. See Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 89 (1979). He did not have the benefit of the admissions made by Shedlock in his deposition, since the deposition was not taken until February 16, 2001, nearly two years later. In this motion for summary judgment, this Court must consider the legal sufficiency of the evidence in the record, not of the allegations made by Shedlock, especially when those allegations are contradicted or diminished by the evidence developed during discovery.
*361 Second, Judge Fremont-Smith did not have the benefit of the Supreme Court decisions in Sutton or Toyota, both of which were decided after he issued his decision. These decisions effectively “raised the bar” that Shedlock needed to hurdle to establish his “disability” under the ADA.
Consequently, this Court finds that, even viewing the evidence in the light most favorable to Shedlock, he may not reasonably be found to be an “individual with a disability” under the ADA.
B. The Rehabilitation Act
The Rehabilitation Act provides:
No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .
29 U.S.C. §794(a). The Rehabilitation Act, like the ADA, defines “disability” as “a physical or mental impairment that substantially limits one or more major life activities.” 29 U.S.C. §705(9)(b). Since the statutory definition of “disability” is the same in the Rehabilitation Act and the ADA, this Court concludes that the Supreme Court decisions that interpret this language under the ADA also interpret its meaning under the Rehabilitation Act. Consequently, since Shedlock may not reasonably be found to be an “individual with a disability” under the ADA, he also may not reasonably be found to be an “individual with a disability” under the Rehabilitation Act.
C. Article 114 of the Massachusetts Constitution
The language of Article 114 of the Massachusetts Constitution nearly mirrors the language of the Rehabilitation Act, except that it is not limited in its scope to programs or activities receiving federal funds:
No otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the commonwealth.
Article 114. Article 114 was adopted by joint sessions of the Massachusetts Legislature in 1977 and 1980, and approved in a ballot question on November 4, 1980, so it preceded by more than three years the enactment of the amendments to G.L.c. 15 IB that prohibit discrimination against handicapped persons in employment. See St. 1983, c. 533, §2. The Supreme Judicial Court, although it has yet to define the word “handicapped” in Article 114, has observed that “the language of the amendment was largely taken” from the Rehabilitation Act, 29 U.S.C. §794, and that “some assistance in construing art. 114 may be found in cases (at least pre-1980 cases)” interpreting §794. Layne v. Superintendent, Massachusetts Correctional Institution, Cedar Junction, 406 Mass. 156, 159 (1989).
From Layne, this Court concludes that a “handicapped individual” under Article 114 means an “individual with a disability” under 29 U.S.C. §794 of the Rehabilitation Act, and that Article 114, like the Rehabilitation Act, defines “disability” as “a physical or mental impairment that substantially limits one or more major life activities.” The far harder question is whether, under this definition of “disability,” mitigating measures or corrective devices must be considered in determining whether the impairment substantially limits a major life activity. As applied to this case, the question posed is whether, under Article 114, this Court should determine whether Shedlock’s physical impairment substantially limits his ability to walk with a cane, or without a cane.
Under the United States Supreme Court’s interpretation of the ADA and, by implication, the Rehabilitation Act, mitigating measures and corrective devices must be considered in determining whether the impairment substantially limits a major life activity, but this was not plain until the Supreme Court decided Sutton in 1999. This issue had not even been considered by any court as of 1980, when Article 114 was enacted. See Dahill v. Police Department of Boston, 434 Mass. 233, 238 (2001) (as of 1983, “no court had determined, or, to our knowledge considered, whether ‘handicapped’ referred to a person’s impairment in its corrected or mitigated condition”). In interpreting essentially the identical statutory definition of “handicapped individual” under G.L.c. 151B, the Massachusetts Supreme Judicial Court came to the opposite conclusionmitigating measures and corrective devices may not be considered in determining whether the impairment substantially limits a major life activity. Dahill, 434 Mass. at 238-43. The Supreme Judicial Court chose to endorse a different interpretation from the United States Supreme Court in part by giving substantial deference to the interpretation of the meaning of “handicapped individual” found in guidelines promulgated by the Massachusetts Commission Against Discrimination, which was authorized by the Massachusetts Legislature to formulate policies to effectuate the purposes of G.L.c. 151B and to adopt rules and regulations to implement those policies. Id. at 239-41. Yet, the Supreme Judicial Court also noted that, beginning with the enactment of Article 114 in 1980, the Massachusetts Legislature has sought to protect handicapped individuals from discrimination, and concluded that this interpretation of the meaning of “handicapped individual” gave “fullest effect” to that remedial purpose. Id. at 241.
This Court concludes, for two reasons, that the Dahill interpretation of “handicapped individual” that applies to G.L.c. 151B should also apply to Article 114: mitigating measures and corrective devices may not be considered in determining whether the impairment substantially limits a major life activity. First, this interpretation, according to our Supreme Judicial *362 Court, best reflects the purpose intended by the Legislature when it enacted Article 114. See Dahill, 434 Mass. at 241. Second, and most persuasively, the law of disability in Massachusetts is already confusing, with identical language in the ADA and G.L.c. 151B being interpreted differently by the United States Supreme Court in Sutton and the Massachusetts Supreme Judicial Court in Dahill It would become even more confusing if Article 114 were found to be governed by the Sutton definition, while G.L.c. 151B were governed by the Dahill definition. Since Article 114 and G.L.c. 151B are similar in purpose and language and overlap in their application, it is far wiser as a matter of pragmatic jurisprudence for their definition of “handicapped individual” to be the same. In short, this Court finds that the Sutton definition applies when one seeks a remedy for handicapped discrimination under federal law, and the Dahill definition applies when one seeks a remedy for handicapped discrimination under Massachusetts law.
The consequence of this interpretation is that this Court must determine, from the evidence in the record, whether Shedlock, without his cane, is substantially limited in his ability to walk. The record, however, is nearly silent on this issue; the only document that speaks to it at all is Shedlock’s Sick Call Request Form, dated November 11, 1997, in which the nurse-practitioner from Correctional Medical Services wrote, “[Patient] observed to walk . . . little to no use of cane for support.” Since the burden rests with the plaintiff to provide evidence that he is substantially limited in his ability to walk, this Court could rule against Shedlock for lack of any evidence on this issue. Alternatively, since it reasonably would not be apparent to counsel to present evidence on this point, this Court could give the parties the opportunity to supplement the record. Since the briefing and argument on this motion has been superb on both sides, this Court would be inclined to pursue the latter alternative. However, if it is plain that Shedlock could not prevail even if he were to establish that he falls within the class of “handicapped individuals” protected under Article 114, then it would be futile to re-open the record. Therefore, this Court will consider whether, viewing the evidence in the light most favorable to Shedlock, he could prevail on his Article 114 claim if he were to demonstrate that he is a “handicapped individual.”
Since the Massachusetts Legislature chose to adopt the language of the Rehabilitation Act when it enacted Article 114, one can infer that the Massachusetts Legislature intended that the obligations owed by the DOC to handicapped prisoners under Article 114 were no greater and no less than the obligations owed to disabled prisoners by any state or local prison that received federal aid and thereby fell within the rubric of the Rehabilitation Act. See Layne v. Superintendent, Massachusetts Correctional Institution, Cedar Junction, 406 Mass. at 159. Unfortunately, the use of the Rehabilitation Act as a reference point provides little useful guidance, because the applicability of both the Rehabilitation Act and the ADA to disabled prisoners in state custody was not firmly established until 1998, when the Supreme Court in Pennsylvania Department of Corrections v. Yeskey, 524 U.S. 206 (1998), first declared that the ADA applied to state prisons.
Article 114 does not expressly limit the obligation owed to handicapped individuals to the provision of reasonable accommodation, but it is plain that this is all the law commands with respect to handicapped individuals. This limitation is made explicit in G.L.c. 93, §103, which provides that “[a]ny person within the commonwealth, regardless of handicap . . . shall, with reasonable accommodation, have the same rights as other persons ... to the full and equal benefit of all laws . . ., including, but not limited to, the rights secured under Article 114 of the Amendments to the Constitution.” (Emphasis added.) Therefore, in deciding whether the evidence in this case, viewed in the light most favorable to Shedlock, is sufficient to support a finding of a violation of Article 114, this Court must first determine when the obligation of reasonable accommodation arises under Article 114 in the context of a prison. Specifically, does it arise only when a handicapped prisoner, without reasonable accommodation, is to be excluded from a program or benefit, or effectively denied access to a prison facility, such as a library or dining hall? Or does it arise, as in public, non-prison housing, when the reasonable accommodation is needed to “afford a handicapped person equal opportunity to use and enjoy a dwelling.” G.L.c. 151B, §4(7A(2)). This Court concludes that, in a prison, the obligation to make reasonable accommodation arises only when, without reasonable accommodation, a handicapped prisoner would be effectively excluded from a program or denied access to a prison facility or activity, not simply when his use or “enjoyment” of the prison falls below that of a non-handicapped prisoner. Under this standard, even if Shedlock were to be protected by Article 114, he would still fail to show a violation of that Article.[1]
Shedlock contends, first, that he was entitled under Article 114 to a first-floor cell because of his handicap. However, Shedlock has offered no evidence that he was excluded from participation in any program, or denied any benefits to which he was entitled as a prisoner, because his cell was not on the first floor before July 16, 1998. He was not, for all practical purposes, confined to the second floor when his cell was on the second floor. The evidence is plain that the DOC did provide him with one reasonable accommodationallowing him use of a caneand that, with this accommodation, he was able, albeit with some pain and difficulty, to walk up and down the stairs from the second floor to attend prison programs and use prison facilities.
Second, Shedlock essentially contends that he was entitled under Article 114 to have the same ready *363 access to all prison facilities, such as the law library, classrooms, and the gym, as those prisoners who are not handicapped in their ability to walk. At most, Article 114 required the DOC to make reasonable accommodation so that handicapped prisoners are not denied reasonable access to prison programs and activities because of then-handicap. There is no evidence, however, that Shedlock has been denied access to any prison program or activity because of his handicap. He physically can walk to these programs and activities and has throughout his time in prison, but he does so slowly, and with difficulty. Article 114 may assure access to programs and privileges, but it surely does not assure easy access.[2]
Carried to its logical conclusion, Shedlock contends that, under Article 114, the DOC is required to make all prison facilities at MCI Norfolk (and, for that matter, every DOC prison) accessible to handicapped prisoners. This Court finds that DOC’s obligations towards handicapped prisoners under Article 114 do not require it to make all its prisons handicapped-accessible; the obligation reasonably to accommodate a prisoner’s handicap may be met by providing the prisoner with the opportunity to transfer to a handicapped-accessible prison. Shedlock has not sought to transfer to another prison, such as MCI-Shirley, that can better accommodate his handicap, perhaps because that prison held a higher security classification. Since a prisoner has no legal right to be incarcerated at the prison of his choice or at a particular security level, he cannot insist that the handicapped-accessible prison be at the same security classification as the prison where he is currently held. Consequently, this Court finds that summary judgment must be granted as to the Article 114 claim because, even if Shedlock could establish that he is handicapped and within the protection of that provision, he still cannot prove any violation of that provision.
The Retaliation Claim
Under the ADA, “[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.” 42 U.S.C. §12203. To prevail on his retaliation claim under the ADA, Shedlock must prove three elements;
i. that he was engaged in protected conduct;
ii. that he suffered adverse action; and
iii. that there was a causal connection between his engaging in protected conduct and his adverse action.
See White v. New Hampshire Department of Corrections, 221 F.3d 254, 262 (1st Cir. 2000); Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st Cir. 1997). The causal connection must demonstrate that the plaintiff would not have been mistreated “but for” the impermissible purpose of retaliation. Layne v. Vinzant, 657 F.2d 468, 475 (1st Cir. 1981). This Court agrees with the defendants that a claim of retaliation must be supported by “more than naked allegations of reprisal . . . lest . . . courts embroil themselves in every disciplinary act that occurs in state penal institutions.” Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994), cert. denied, 514 U.S. 1022 (1995). Rather, the plaintiff, at. a minimum, must present a chronology of events that circumstantially permits a reasonable inference that the adverse action suffered by the plaintiff would not have occurred but for the purpose of retaliation.
Viewing the evidence in this record in the light most favorable to Shedlock, this Court finds that there is evidence sufficient to permit the inference that he was transferred to a second-floor cell on February 5, 1998 in retaliation for invoking what he understood to be his rights under the ADA to a first-floor cell. When he was ordered to transfer to a second-floor cell, Shedlock had obtained a special needs medical order directing that he be housed indefinitely in a first-floor cell, and told both Sgt. Hamm and Sgt. Wilson about the medical order. Sgt. Wilson nonetheless insisted that he either go to the second-floor cell or receive a disciplinary report that would land him in the disciplinary unit at the Receiving Building. A factfinder is permitted to infer that this transfer was motivated by Shedlock’s challenge to the earlier transfer to a second-floor cell, his appeal of his disciplinary finding (which had been denied only three days earlier), and his obtaining a special needs medical order just one day earlier directing that he be housed in a first-floor cell.
There is not evidence, however, to support the inference that, but for Shedlock’s filing of this complaint or otherwise invoking his rights under the ADA, Dr. Brewer would not have rescinded Shedlock’s special needs medical order for a stand-up locker. Shedlock filed suit in this action in July 1998. Shedlock obtained the medical order for a stand-up locker on February 12, 1999. Captain Krantz discussed with Shedlock on March 9, 1999 the logistical problems that a stand-up locker caused to the renovations the prison was undergoing, and Shedlock wrote the DOC Commissioner that same day about the conversation, asking the DOC to honor its obligations under the ADA. Dr. Brewer’s recission of the special order did not take place until January 7, 2000, after Dr. Brewer had visited Shedlock’s cell and discovered that Shedlock was storing winter clothes and his typewriter under the bed. No reasonable inference can be drawn from this chronology that, but for Shedlock’s invocation of his ADA rights, Dr. Brewer would not have rescinded the medical order for a stand-up locker.
a. Qualified Immunity
While this Court finds sufficient evidence of retaliation in violation of the ADA on February 5, 1998, that does not mean that this cause of action will survive summary judgment. Under the doctrine of qualified immunity, the correctional officers are “shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or con *364 stitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 427 U.S. 800, 818 (1982). For the individual correctional officers to be held liable for retaliating against Shedlock because of his invocation of rights under the ADA, these officers reasonably must have understood that Shedlock, as a prisoner, had rights under the ADA. As the Supreme Court declared in Anderson v. Creighton:
The contours of the right [allegedly violated] must be sufficiently clear that a reasonable official would understand that what he was doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the lawfulness must be apparent.
483 U.S. 635, 640 (1987). Whether an asserted federal right was “clearly established” at the time the alleged violation occurred is a question of law, not of fact, and therefore should not be examined under the usual summary judgment standard that requires that all facts be viewed in the light most favorable to the non-moving party. See Elder v. Holloway, 510 U.S. 510, 516 (1994); St. Hilaire v. City of Laconia, 71 F.3d 20, 24 (1st Cir. 1995). This Court finds that the individual defendants reasonably would not have understood that state prisoners were protected under the ADA on February 5, 1998, because the Supreme Court did not declare that the ADA applied to state prisoners until June 15, 1998, when it decided Pennsylvania Department of Corrections v. Yeskey, 524 U.S. 206 (1998), and the holding in Yeskey was not apparent from pre-existing law. Key v. Grayson, 179 F.3d 996, 1000-01 (6th Cir. 1999); Hall v. Thomas, 190 F.3d 693, 696-97 (5th Cir. 1999). Consequently, even if Sgt. Hamm and Sgt. Wilson had retaliated against Shedlock on February 5, 1998 for his having challenged his earlier transfer to a second-floor cell, his appeal of his disciplinary finding, and his obtaining a special needs medical order to be housed in a first-floor cell, they cannot be held liable for damages under the ADA because they could not reasonably have known at that time that Shedlock had any rights under the ADA.
b. Eleventh Amendment Immunity
Unless the Commonwealth of Massachusetts consented to be liable for damages on the ADA retaliation claim, damages may be obtained against the Commonwealth on this claim only if Congress abrogated the Commonwealth’s Eleventh Amendment immunity under the United States Constitution by (1) unequivocally intending to do so and (2) acting pursuant to a valid grant of constitutional authority under Section 5 of the Fourteenth Amendment. University of Alabama v. Garrett, 531 U.S. 356, 364 (2001).[3]
This Court finds that the Commonwealth has not consented to liability for damages on such a claim. The retaliation claim is brought under the ADA, not the Rehabilitation Act (which has no provision governing retaliation), so those cases that conclude that a state consents to damage claims under the Rehabilitation Act when they accept the federal funds that place the conduct within the scope of the Rehabilitation Act are inapposite. Compare with New York v. United States, 505 U.S. 144, 168 (1992); Jim C.v. Atkins School District, 235 F.3d 1079, 1080 (8th Cir. 2000), cert. denied, 533 U.S. 949 (2001) (“The choice is up to the state; either give up federal aid ... or agree [it] can be sued under the [the Rehabilitation Act]”). Since the Commonwealth’s prisons are governed by the ADA regardless of whether Massachusetts accepts federal funds, its acceptance of such funds cannot be deemed consent for damage liability under the ADA.
Nor can the Commonwealth be found to have consented to be sued for damages on ADA retaliation claims because it waived immunity for similar state law claims. See Erickson v. Board of Governors, 207 F.3d 945, 952 (7th Cir. 2000). Article 114, while similar to the ADA in the protections it provides to the handicapped, does not provide any claim for retaliation.
In the absence of consent, this Court must determine (1) whether Congress intended to abrogate the state’s Eleventh Amendment immunity as to ADA claims and, if it did, (2) whether Congress in doing so acted pursuant to a valid grant of constitutional authority under Section 5 of the Fourteenth Amendment. As to the first question, there can be no doubt that Congress intended such abrogation with the ADA. 42 U.S.C. §12202 of the ADA expressly declares that “a State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in federal or state court of competent jurisdiction for a violation of this chapter.”
The second question is far more difficult. In Garrett the Supreme Court held that Congress had the constitutional authority to abrogate state sovereign immunity only as necessary to enforce under Section 5 of the Fourteenth Amendment the constitutional rights granted under Section 1 of the Fourteenth Amendment. 531 U.S. at 364. The Court noted that Congress’s power to enforce the Fourteenth Amendment “includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment’s text.” Id. at 365, quoting Kimel v. Florida Bd. of Regents, 528 U.S. 62, 81 (2000). The Court required, however, that “§5 legislation reaching beyond the scope of §l’s actual guarantees must exhibit ‘congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.’ ” Garrett, 531 U.S. at 365, quoting City of Boerne v. Flores, 521 U.S. 507, 520 (1997). The Court found that
the disabled were not a “suspect class” under constitutional jurisprudence and were entitled only to the “rational basis” standard of review; id. at 366; *365 Congress, in enacting the ADA, did- not identify or find a pattern of discrimination by the states against the disabled that violated the rational basis test of the Fourteenth Amendment; id. at 370-72;
legislation, like the ADA, that required that special accommodation be made for the disabled did not derive from the Fourteenth Amendment; id. at 367-68; and therefore
Congress was not authorized to abrogate state sovereign immunity by granting a damage remedy against the states for violation of Title I of the ADA.
Id. at 372-74.
The Court in Garrett expressly limited the scope of its decision to Title I of the ADA. Id. at 360 n. 1. The ADA prohibition against retaliation, however, is found in the miscellaneous provisions in Title IV, not in Title I, and the alleged retaliation here involves retaliation for the invocation of rights under Title II of the ADA, prohibiting discrimination against the disabled in public services. In Kiman v. New Hampshire Department of Corrections, the First Circuit recently held that Congress was authorized to abrogate state sovereign immunity for ADA damage claims brought by a prisoner under Title II when the plaintiff prisoner has alleged facts sufficient to establish an Eight Amendment violation of the prohibition against cruel and unusual punishment. 301 F.3d 13, 25 (1st Cir. 2002). The cause of action under the ADA for retaliation is intended to protect a disabled person’s ability to invoke his substantive rights under the ADA by prohibiting conduct that may chill the exercise of those rights. The Supreme Court, having found in Garrett that Congress cannot abrogate state sovereign immunity to provide a damage remedy for the violation of a right bestowed solely by statute, is unlikely to find that Congress can abrogate sovereign immunity to provide a damage remedy for the violation of a statutoiy right to be free from retaliation in pursuing that statutoiy claim. Under Kiman, such an abrogation may perhaps be found when the retaliatoiy conduct concerned an ADA claim under Title II that was also of constitutional dimension. Here, however, Shedlock does not (and reasonably cannot) claim that the ADA violations he complained about were also violations of his constitutional rights. Unlike in Kiman, there is no evidence that the Department of Correction’s conduct here approached a violation of the Eighth Amendment right to be free from cruel and unusual punishment. Therefore, this Court concludes that Shedlock has no damage remedy for retaliation against the Commonwealth, because Congress did not have the authority to abrogate state sovereign immunity to provide a damage remedy for a claim of retaliation when the underlying substantive allegations against the Department of Correction, as here, fall short of an Eighth Amendment constitutional claim.
For all these reasons, with no damage remedy lawfully available to Shedlock on the surviving allegations of retaliation, the defendants’ motion for summaiy judgment on the retaliation claim must be allowed.
Civil Rights Claim under the Massachusetts Civil Rights Act
Under the Massachusetts Civil Rights Act (“MCRA” or “the Act”):
Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth has been interfered with, or attempted to be interfered with [by threats, intimidation or coercion] may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief. . ., including the award of compensatoiy money damages . . .
G.L.c. 12, §§11H and 111. The Supreme Judicial Court has described the legislative purpose behind the passage of this Act in 1979:
The Legislature passed this statute to respond to a need for civil rights protection under State law. Deprivations of secured rights by private individuals using violence or threats of violence were prevalent at the time that the Legislature considered G.L.c. 12, §§11H and 1II. . . Aggrieved parties often could not succeed under 42 U.S.C. §1983 . . . because the Federal statute requires “State action”... The statute encompassed private action where otherwise “State action” would be required . . . We conclude that the Legislature intended to provide a remedy under G.L.c. 12, §§111, coextensive with 42 U.S.C. §1983 . . ., except that the Federal statute requires State action whereas its State counteipart does not. ..
Batchelder v. Allied Stores Corp., 393 Mass. 819, 821-23 (1985).
“Like all civil rights statutes, §§11H and 111 are entitled to liberal construction. Accordingly, cases within the reason, although not within the letter, of a remedial statute are embraced by its provisions.” Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass. 93, 99 (1987) (citations omitted). Yet, the Supreme Judicial Court has also recognized “that by the Civil Rights Act, the Legislature did not intend to create a vast constitutional [and statutory] tort . . .” Freeman v. Planning Board of West Boylston, 419 Mass. 548, 565 (1995), cert. denied, 116 S.Ct. 337 (1995), quoting Bally v. Northeastern University, 403 Mass. 713, 718 (1989), which quotes Bell v. Mazza, 394 Mass. 176, 182 (1985) (internal quotation marks omitted). “[T]he insertion by the Legislature of the requirement of threats, intimidation or coercion was specifically intended to limit liability under the Act.” Freeman v. Planning Board of West Boylston, 419 Mass. at 565-66.
To prevail on a claim under MCRA, the plaintiffs must prove that:
*366 1. [their] exercise of enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth,
2. have been interfered with, or attempted to be interfered with, and
3. that the interference or attempted interference was by threats, intimidation or coercion.
Freeman, 419 Mass. at 564.
Even viewed in the light most favorable to Shedlock, the evidence in the summary judgment record falls short as to the third element of “threats, intimidation or coercion.” Shedlock alleges two acts of “threats, intimidation or coercion": (1) Sgt. Wilson’s filing of a disciplinary report against him on December 23, 1997 for failing to transfer from one second-floor cell to another; and (2) Sgt. Parks’ statement to him that “your stay here is going to be bad” if he were to appeal the guilty finding at his disciplinary hearing.
Sgt. Wilson’s filing of a disciplinary report cannot be construed as either a threat or intimidation; it must instead be examined to determine whether it constituted “coercion” under MCRA. Coercion is “the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.” Planned Parenthood League of Massachusetts, Inc. v. Blake, 417 Mass. 467, 474 (1994), quoting Webster’s New International Dictionary at 519 (2d ed. 1959). The filing of a disciplinary report in this case cannot reasonably be deemed to constitute “coercion” in violation of MCRA. The filing of the report did not constrain Shedlock from doing anything; it simply initiated an administrative disciplinary proceeding to sanction him for refusing to comply with Sgt. Wilson’s directive. Indeed, if the mere filing of a disciplinary report were deemed to constitute “coercion,” an MCRA claim potentially could be brought against a correctional officer whenever he commenced such an administrative proceeding.
Sgt. Parks’ alleged statement, standing alone, also falls short of what is needed to prevail on the element of “threats, intimidation or coercion.” A threat “involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm.” Planned Parenthood League of Massachusetts, Inc. v. Blake, 417 Mass. at 474. The threat must involve “an actual or potential physical confrontation accompanied by a threat of harm.” Id. at 473 and cases cited. Here, there was no “actual or potential physical confrontation” between Shedlock and Sgt. Parks.
The most sinister interpretation that could be given to this statement is that Sgt. Parks threatened that he would take steps to ruin Shedlock’s stay at MCI Norfolk if Shedlock appealed. However, even under this most sinister interpretation, it could not reasonably be understood that Sgt. Parks would cause Shedlock any physical harm or damage his property. (See Findings of Fact, Conclusions of Law, and Order for Judgment, Buster v. George W. Moore, Inc. et al., 2000 WL 576363 (Mass. Super. 2000) (Gants, J.), for a detailed discussion regarding the requirement of harm in MCRA.) Sgt. Parks, as the disciplinary hearing officer, did not have any day-to-day interaction with Shedlock or other inmates. Nor is there any evidence that Sgt. Parks did anything to make Shedlock’s life at MCI Norfolk “bad.” If a statement like this, standing alone, were sufficient to constitute a threat under MCRA, then MCRA would indeed become precisely what the Legislature did not want it to becomea “vast constitutional [and statutory] tort.” See Freeman v. Planning Board of West Boylston, 419 Mass. at 565.
For these reasons, summary judgment is granted to the defendants on Shedlock’s MCRA claim.
ORDER
For the reasons stated above, the defendants’ motion for summary judgment is ALLOWED as to all defendants and all counts, and the plaintiffs motion for summary judgment is DENIED. Judgment shall enter in favor of the defendants.

To be clear, this Court understands that a finding that a prison has an obligation to provide reasonable accommodation does not end the inquiry. Once such a finding is made, the Court must determine, as a question of fact, whether the accommodation was reasonable “in light of safety and security concerns in the prison setting,” and the financial burden imposed by the accommodation. Chisolm v. McManimon, 275 F.3d 315, 329 (3rd Cir. 2001); Randolph v. Rogers, 170 F. 3d 850, 859 (8th Cir. 1999). In the instant case, the Court does not reach the question of the reasonableness of the accommodation because it concludes that the prison here had no duty to make reasonable accommodation for Shedlock beyond allowing him to use a cane.

In his deposition, Shedlock said that he did not know of any program that he was interested in doing at MCI-Norfolk but was unable to attend because of his handicap. Shedlock deposition at 57. He later said he was interested in attending a Zen Buddhism group but had not attended because “they’re in the CSD building and there’s more stairs over there than I can deal with.” Id. However, he also said that he had not spoken to anyone on the MCI-Norfolk staff or the classification board about attending those programs. Id. at 57-58.
The only facility he said he did not attend because of his handicap was the gym, which he said was “located in a depression” that was accessible via a flight of concrete stairs without a handrail. Id. at 76. He did not say he could not reach the gym; he simply said it was “difficult to get to the gym.” Id. However, he also said he never made any request for assistance in getting to the gym apart from asking someone in administration (whose name he could not recall) at “happy hour” about having a handrail put in. Id. at 76-77.

The Eleventh Amendment to the United States Constitution, by its terms, bars federal courts from adjudicating claims brought against a state by citizens of another state or a foreign country. However, the Supreme Court has interpreted the Amendment also to bar federal courts from adjudicating claims against states brought by their own citizens. See University of Alabama v. Garrett, 531 U.S. at 364, and cases cited. It has also interpreted the Amendment to protect nonconsenting states from being sued for damages in state court on claims based on federal statutes, such as the ADA. Alden v. Maine, 527 U.S. 706, 712 (1999).