NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-15                                            Appeals Court

   TUFTS MEDICAL CENTER  vs.  MARIE LUNIE DALEXIS[1] & another.[2]


No. 22-P-15.

   Suffolk.     October 13, 2022. – September 21, 2023.

       Present:  Green, C.J., Henry, & Englander, JJ.


Massachusetts Commission Against Discrimination.  Anti-
     Discrimination Law, Employment, Handicap, Termination of
     employment.  Employment, Discrimination, Constructive
     discharge.  Handicapped Persons.  Nurse.




     Civil action commenced in the Superior Court Department on
January 17, 2020.

     The case was heard by Jeffrey A. Locke, J., on motions for
judgment on the pleadings.


     Gregory A. Brown for the plaintiff.
     Caitlin A. Sheehan for Massachusetts Commission Against
Discrimination.
     Howard Mark Fine for Marie Lunie Dalexis.


_____

     [1] Marie Lunie Dalexis died while this matter was pending
before the full commission of the Massachusetts Commission
Against Discrimination.  Her claim is defended by Jonel Dalexis,
the personal representative of her estate.

     [2] Massachusetts Commission Against Discrimination.

GREEN, C.J.  Tufts Medical Center (Tufts) appeals from a judgment of the Superior Court affirming the decision and order of the Massachusetts Commission Against Discrimination (commission), which found that Tufts had discriminated against one of its nurses, Marie Lunie Dalexis, on the basis of her disability.[3]  See G. L. c. 151B, § 4 (16).  The commission's finding (which followed a public hearing before a hearing officer) was based on adverse employment actions taken against Dalexis after her doctor informed Tufts that, due to her medical conditions, Dalexis could not work overtime.  The commission concluded that, by refusing to excuse Dalexis from the obligation to work overtime when needed, Tufts had failed to offer Dalexis a reasonable accommodation for her disability.  In addition, the commission concluded that Tufts had failed to engage in the dialogue required by G. L. c. 151B, and had constructively discharged Dalexis.  For these statutory violations, the commission awarded Dalexis damages and attorney's fees.  Our review of the administrative record reveals that the commission's decision was supported by

---

[3] "[T]he words 'disabled' and 'disability' are the more common and accepted parlance than the words 'handicapped' and 'handicap.'  The word 'handicap,' however, is utilized in the governing statute and regulations."  Massachusetts Commission Against Discrimination, Guidelines:  Employment Discrimination on the Basis of Handicap, Chapter 151B, § I n.1 (1998).  Like the commission, this decision will use the words "handicap," "handicapped," "disability," and "disabled."

substantial evidence and free from error of law.  See G. L.
c. 30A, § 14 (7).  Accordingly, under the deferential standard
we apply to our review of such decisions, we affirm the judgment
of the Superior Court affirming the commission's decision.

Background.  We summarize the relevant facts found by the
hearing officer and adopted by the commission.

In 2002, Dalexis was hired by Tufts, a major medical
institution in Boston, as an inpatient registered nurse
(registered nurse or inpatient nurse).  During the relevant time
period, Tufts operated twenty-two inpatient units and employed
694 registered nurses to work those units.  Nurses in the
inpatient units operated on three shifts:  the day shift (7 A.M.
to 3:30 P.M.), the evening shift (3 P.M. to 11:30 P.M.), and the
night shift (7 P.M. or 11 P.M. to 7:30 A.M.).  No nurse worked
solely on the day shift.  Instead, the majority of nurses worked
a combination of day and evening (day-evening) shifts or,
alternatively, day and night (day-night) shifts as
"day/rotators."

At Tufts, Dalexis first worked in an oncology unit and then
in an oncology medical-surgical unit.  In 2005, she transferred
to Proger 5 North (PG5N), a medical-surgical unit, where she
worked as a "day/rotator" on the day-evening shift.  On

occasion, Dalexis also worked as a charge nurse.[4]  Dalexis

generally performed well; in the hearing officer's words, she

"received an overall rating of 'excels' on her 2008 performance

appraisal -- the last one submitted into evidence."

On any given day at Tufts, administrators had to ensure

that all the various nursing posts were properly staffed, which

included accounting for nurses out on vacation, out sick, or who

became ill over the course of the day.  Patient demand could

change over the course of the day as well, sometimes

substantially.  At the relevant time, Tufts utilized a specific

staffing system to fill the required nursing shifts when the

need arose.  Open shifts were filled first by the so-called

"float pool" nurses, then by per diem nurses,[5] then by staff

nurses not scheduled on that day, then by staff nurses present

on the floor who volunteered to stay through the next shift on

an overtime basis, and finally by nurses present on the floor

who were required to stay until a replacement was found.  Nurses

also could be required to stay past the end of their scheduled

---

[4] The hearing officer described the charge nurse position as follows:  "A charge nurse takes responsibility for the flow of care on the floor, making sure that patients are properly admitted, collaborating with the emergency room, and assigning nurses to care for patients."

[5] Unlike float pool nurses, per diem nurses were not guaranteed to work a specified number of hours per week and did not receive benefits.

shifts if, for instance, a nurse on the next shift called out sick or a patient became critically ill. A nurse scheduled to work on the evening shift in this scenario then would work some portion of the night shift on an overtime basis. A critical consideration for Tufts in making overtime decisions was the need to ensure that a sufficient number of nurses were on duty at all times to provide an appropriate level of patient care.

The collective bargaining agreement (CBA) between Tufts and Dalexis's union, the Massachusetts Nurses Association, provided Tufts "the right to require reasonable overtime work," and defined overtime work to include any work performed in excess of a forty-hour work week and any work in excess of five, full-time shifts in a week.[6,7] The job description for the registered nurse position listed as one of the "physical demands/working conditions" that the employee is "[s]ubjected to irregular hours."

---

[6] Tufts presented testimony that overtime is "[a]nything beyond a nurse's normal shift, or anything over 40 [hours] in a work week."

[7] The events at issue in this case predate the Legislature's enactment of G. L. c. 111, § 226, inserted by St. 2012, c. 224, § 103, which governs when a hospital may require a nurse to work mandatory overtime. That statute prohibits mandatory overtime "except in the case of an emergency situation where the safety of the patient requires its use and when there is no reasonable alternative." G. L. c. 111, § 226 (b). However, the statute does not "limit, alter or modify the terms, conditions or provisions of a collective bargaining agreement entered into by a hospital and a labor organization." G. L. c. 111, § 226 (h).

During the 2009 fiscal year when Dalexis sought to return to work with an accommodation, 94.67 percent of inpatient nurses worked at least some overtime.  However, the amount of overtime worked by individual nurses varied greatly, with some nurses working hundreds of hours of overtime and others working minimal amounts -- as little as three hours.  Of the nurses who worked some overtime, fifty-seven percent worked in excess of a forty-hour work week; the remainder worked overtime in excess of their scheduled shifts but not more than forty hours per week.  And some nurses -- 5.33 percent -- worked no overtime at all.  Nurses averaged a little less than one hour of overtime per week.[8]

As the hearing officer found, Dalexis "never had to force a nurse to work overtime when she served as charge nurse and she never had to work overtime against her will."  Moreover, the commission relied on the hearing officer's finding that Dalexis assured Tufts that in the event of an emergency requiring overtime, she would never abandon a patient.[9]

Near the end of 2005, Dalexis began to experience health

---

[8] Dalexis averaged about two hours of overtime per week in 2008 and before she went on leave in 2009.

[9] The commission observed, "It is important to note that the [h]earing [o]fficer also credited [Dalexis]'s testimony that she would never leave a patient that needed her even if that required her to work past her normal shift hours."

issues.  The following year, she was diagnosed with rheumatoid arthritis, which caused her to feel "really sick" and stiff, and to have low energy.  Dalexis's rheumatoid arthritis also caused her to contract interstitial lung disease.  As a result, Dalexis experienced difficulty breathing, pain and "crackles" in her lungs, and an inability to run or climb stairs.  During this time, Dalexis continued to work the day-evening shift on PG5N, but took intermittent leave for her health issues.

In 2007, Dalexis submitted a note from her doctor explaining that Dalexis could not work past the normal hours of her shift due to her interstitial lung disease.  As a temporary accommodation, Dalexis's nurse manager at the time excused her from working overtime.[10]

From October 2008 to May 2009, Dalexis continued to take intermittent leave as needed under the Family and Medical Leave Act (FMLA).  In late May 2009, Dalexis took FMLA leave but her absence from work was prolonged after she underwent emergency surgery.  In July 2009, Tufts determined that Dalexis had exhausted her FMLA leave and her protected medical leave under

---

[10] The hearing officer did not make an explicit finding as to the duration of this accommodation, and the administrative record is unclear on the point.  In the commission proceedings, Tufts maintained that the accommodation was in place for ten days, while Dalexis asserted that she received an accommodation for "several months."  Nothing in our analysis turns on the length of the temporary accommodation.

the terms of the CBA.[11]  Dalexis was accordingly informed that her position on PG5N would be filled, and she would need to apply for open positions when she was ready to return.

On September 8, 2009, Dalexis's doctor cleared her to return to work the following month.  At Tufts's direction, Dalexis met with a nurse recruiter to identify job opportunities and also applied for several inpatient nursing positions that were posted online; however, she did not receive any interviews, at least in some instances because the positions to which she applied were outside of her specialty areas.

During Dalexis's search for a nursing position at Tufts in the fall of 2009, three non-float, day-rotator jobs on PG5N were unfilled, but Tufts did not alert Dalexis to the openings.  A fourth non-float, day-rotator position on PG5N was posted on October 23, 2009, and Tufts again did not notify Dalexis of the opening.  In addition, two float pool, day-rotator jobs for medical/surgical units were posted in May and August 2009 and remained unfilled during Dalexis's job search, and a third was posted for which Dalexis applied on October 23, 2009, but Tufts did not interview her for the position.  These positions could be day-evening shift or day-night shift positions, and Dalexis

---

[11] The CBA required Tufts to hold open the position of a nurse on medical leave for ninety days.  Although Tufts extended the protection for up to sixty additional days for some individuals, it declined to do so in Dalexis's case.

testified that she would have asked to work the day-evening shift.  Julie Miglietta, the employee relations specialist and manager for Tufts, testified that Dalexis did not get an interview for this float pool, day-rotator position because her overtime restriction made her ineligible.  But at that time, Dalexis was cleared to return to work with no restrictions.[12]

Dalexis first raised her need for an accommodation on November 6, 2009, when she was offered a vacant night-shift position on PG5N -- which, at the time, had not yet been advertised.  Dalexis declined the position, explaining that she "can't work nights" because doing so would exacerbate her rheumatoid arthritis.  Dalexis and Miglietta then followed up with Dalexis's doctor to clarify the nature of her work

---

[12] The hearing officer also found that on October 27, 2009, nurse manager Alyson Shea hired Claudia Ballway "into a non-float day-rotator position on [PG5N] 4, four days after it was posted."  Of particular note, although Shea testified that this position involved twelve-hour shifts, the hearing officer found that "[n]othing in the record support[ed] this assertion." Ballway was hired the same day she submitted her application. The hearing officer specifically found that

> "Shea states that she did not notify [Dalexis] about the posting because that wasn't her 'role' even though she had called [Dalexis] the prior summer to inform [Dalexis] that her position was being posted.  Shea claims that she was not aware that [Dalexis] had been cleared to return to work despite the note from Dr. Katz clearing [Dalexis] to return to work full-time as of October 19, 2009. . . .  [Dalexis] submitted he[r] [doctor's] note to Risk Manager Patti Andrews."

restrictions. Ultimately, Dalexis's doctor provided a note to Tufts on December 10, 2009, explaining that Dalexis "may work a normal daytime . . . shift [but] . . . cannot work overtime or [n]ight shifts." Based on that information, Miglietta concluded that Dalexis was not eligible for an inpatient nurse position because the ability to work overtime when needed was an essential function of that position.[13]

In December 2009, Dalexis initiated a grievance concerning her reemployment rights that was ultimately unsuccessful. During the grievance process, Miglietta asked Dalexis to contact her doctor once again, to determine whether she could work some nights and overtime. Dalexis did so and, according to a follow-up e-mail message sent by Dalexis on May 5, 2010, her doctor declined to lift or modify the restrictions and cited "overexhaustion" as the cause of flareups of her disease. In light of those restrictions, Tufts concluded that Dalexis's return to work in an inpatient capacity was unlikely and she could be processed for separation as of June 5, 2010.

Dalexis filed a complaint with the commission charging Tufts with discriminating against her on the basis of her

---

[13] Miglietta also determined that a clinic position in a doctor's office, rather than an inpatient hospital position, would be a better assignment given Dalexis's restrictions. Miglietta and others at Tufts encouraged Dalexis to seek employment outside of the organization.

disability, among other protected statuses.[14] After an evidentiary hearing, the hearing officer found that Dalexis was a disabled employee due to her interstitial lung disease and rheumatoid arthritis,[15] and that Dalexis could have returned to work with a reasonable accommodation. The hearing officer explained that on "the unique facts of this case," Tufts should have accommodated Dalexis by excusing her from overtime and night-shift work. The hearing officer also concluded that, once Dalexis requested an accommodation, Tufts failed to participate in an effective interactive process with her, resulting in Dalexis's constructive discharge effective October 19, 2009, the

---

[14] In addition to charging disability discrimination, Dalexis alleged discrimination based on national origin and race, and sought to hold Miglietta individually liable. The hearing officer found that Dalexis abandoned the national origin and race-based claims and failed to prove her claim against Miglietta. Dalexis did not seek further review on these claims, and they are not before us.

[15] The hearing officer also found that Tufts regarded her as disabled, a finding that, the commission concluded, was supported by substantial evidence. See G. L. c. 151B, § 1 (17) (c). We agree with that assessment. On appeal, Tufts argues that the hearing officer violated its rights by deciding a claim that was neither in the administrative complaint nor tried by consent. Even if the commission erred, given Dalexis's undisputed satisfaction of the first prong of the definition of "handicap," Tufts's substantial rights were not prejudiced. See G. L. c. 151B, § 1 (17) (a) (person has "handicap" if she suffers from "a physical or mental impairment which substantially limits one or more major life activities"); Dahill v. Police Dep't of Boston, 434 Mass. 233, 241 (2001) ("A plaintiff may prove that [she] is a handicapped person under one, two, or all of the three statutory definitions").

date Dalexis was medically cleared to return to work.[16]  However, the hearing officer made no explicit finding as to whether the ability to work overtime was an essential function of the inpatient nurse position.[17]  The hearing officer awarded Dalexis back pay, compensatory and emotional distress damages, plus interest.

Tufts appealed to the full commission, arguing, in part,

---

[16] Specifically, the hearing officer found:

"The foregoing evidence supports a conclusion that [Tufts] could have fashioned a reasonable accommodation whereby [c]omplainant, in October of 2009, returned to [PG5N] or to a float assignment in a day or day-evening rotator capacity without overtime and night-shift requirements.  Rather than permit [c]omplainant to do so, however, [r]espondents offered her a single night-shift position, discussed the possibility of firing her if she refused the position, failed to interview her for numerous vacant day-rotator positions on [PG5N], and only relented on interviewing her in order to placate her union, the Massachusetts Nurs[es] Association.  These actions indicate that [r]espondents sought to thwart, not assist, [c]omplainant's return to work."

The hearing officer also concluded that overtime could have been waived "in [c]omplainant's situation without causing any undue hardship to [Tufts] or to [c]omplainant's co-workers."

[17] Though the hearing officer made no explicit finding on the question whether the ability to work overtime is an essential function, she expressed skepticism about the importance Tufts placed on its ability to require overtime when necessary.  Among other things, the hearing officer observed that, though the CBA authorized Tufts to require overtime work, the agreement did not require the imposition of overtime.  She also noted the number of nurses, including the nurse hired on PG5N instead of Dalexis in the fall of 2009, who worked little or no overtime in fiscal year 2009.

that the hearing officer erred by failing to conclude that overtime work was an essential function of an inpatient nursing position. On that issue, the commission concluded that the hearing officer made an implicit determination that working overtime was not an essential function of the position and expressed its agreement with that conclusion, stating its view that the factual findings on which that conclusion was based were supported by substantial evidence. The commission went on to affirm the hearing officer's decision in its entirety. A judge of the Superior Court affirmed the commission's decision. This appeal followed.

Discussion. "For the purpose of judicial review, 'the Decision of the Full Commission . . . shall constitute the Final Order of the Commission.'" Temple Emanuel of Newton v. Massachusetts Comm'n Against Discrimination, 463 Mass. 472, 479 (2012), quoting 804 Code Mass. Regs. § 1.24(1) (1999). In our review of the commission's decision, we accept the hearing officer's conclusions and factual findings (and the reasonable inferences drawn therefrom) as long as they are supported by substantial evidence and are free from error of law. See Massasoit Indus. Corp. v. Massachusetts Comm'n Against Discrimination, 91 Mass. App. Ct. 208, 210 (2017). See also G. L. c. 30A, § 14 (7); G. L. c. 151B, § 6. Substantial evidence is "such evidence as a reasonable mind might accept as

adequate to support a conclusion." G. L. c. 30A, § 1 (6). We give deference to the commission's findings where the evidence is conflicting, in light of the agency's "experience, technical competence, and specialized knowledge . . . , as well as the discretionary authority conferred on it." G. L. c. 30A, § 14 (7). See Ramsdell v. Western Mass. Bus Lines, Inc., 415 Mass. 673, 676 (1993); Smith College v. Massachusetts Comm'n Against Discrimination, 376 Mass. 221, 224 (1978). A court reviewing the decision of an administrative agency will not substitute its judgment on a question of fact for that of the agency. See Southern Worcester County Regional Vocational Sch. Dist. v. Labor Relations Comm'n, 386 Mass. 414, 420-421 (1982). See also Zoning Bd. of Appeals of Wellesley v. Housing Appeals Comm., 385 Mass. 651, 657 (1982) (court may not displace administrative choice between two fairly conflicting views, even if court would justifiably have made a different choice had the matter been before it de novo).

In its challenge to the commission's decision, Tufts does not contest the finding that Dalexis was a "handicapped person" within the meaning of G. L. c. 151B, § 1 (17) and (19), but contends that her claim nonetheless fails because she was unable to perform an essential function of the job of an inpatient

nurse:  to work overtime when required.[18]  See G. L. c. 151B, § 1 (16) (defining "qualified handicapped person" entitled to bring claim under statute).  In other words, Tufts contends that the commission erred in concluding that overtime work was not an essential function of the job.

Determining whether a particular job function is "essential" for purposes of G. L. c. 151B "is intensely fact-based and requires 'individualized inquiry and . . . appropriate findings of fact.'"  Cargill v. Harvard Univ., 60 Mass. App. Ct. 585, 587 (2004), quoting Cox v. New England Tel. & Tel. Co., 414 Mass. 375, 383 (1993).  In Cargill, this court identified several nonexclusive factors to consider in determining whether a particular function is essential.  They include (but are not limited to):

"(i) The employer's judgment as to which functions are

---

[18] Tufts further contends that it was not required to offer Dalexis an accommodation that excused her performance of overtime work, because under the law it is not required to provide an accommodation that excuses performance of an essential function.  See Godfrey v. Globe Newspaper Co., 457 Mass. 113, 124 (2010) ("Neither elimination of an essential duty from a position nor assignment to an unrelated position are 'reasonable accommodations' within the meaning of G. L. c. 151B, § 1"); Massachusetts Commission Against Discrimination, Guidelines:  Employment Discrimination on the Basis of Handicap, Chapter 151B, § II.B (1998) ("The law does not require an employer to hire, promote or retain a handicapped person who cannot perform the essential functions of the job").  Because we discern no error in the commission's conclusion that overtime work was not an essential function of the job of an inpatient nurse, the factual premise for Tufts's argument necessarily fails, and we need not address the argument further.

essential;

"(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

"(iii) The amount of time spent on the job performing the function;

"(iv) The consequences of not requiring the incumbent to perform the function;

"(v) The terms of a collective bargaining agreement;

"(vi) The work experience of past incumbents in the job; and/or

"(vii) The current work experience of incumbents in similar jobs."

Cargill, supra at 596, quoting 29 C.F.R. § 1630.2(n)(3) (2003).

See Labonte v. Hutchins & Wheeler, 424 Mass. 813, 823 n.13 (1997).

Cases involving the question whether overtime work (as compared to a discrete physical task) is an essential function pose a particular challenge in applying the analytical framework; an employee may be capable of performing each and every physical task required for the job and yet still be unable to perform an essential function of the job if overtime work is an essential function and she is unable to work overtime when needed (indeed, that is precisely the question of the present case). In theory, the need to require overtime is to some extent subject to the control of the employer, since it depends in part on the staffing complement assigned to each shift, and

an employer could (in theory at least) assign staff to each shift in excess of ordinarily expected needs in order to provide a cushion to absorb temporary surges in demand. In reality, however (and setting aside the additional cost of routinely carrying staffing capacity that exceeds expected needs), in many settings the need for overtime on any particular occasion is subject to any number of unpredictable factors.

In the present case, in explaining its conclusion that working overtime is not an essential function of the job of an inpatient nurse, the commission emphasized the hearing officer's findings that the CBA does not mandate overtime, and that, while many nurses in fact worked overtime, some nurses performed as little as three hours of overtime during a full year, and more than five percent of Tufts nurses worked no overtime at all.[19] And the commission noted that Dalexis herself was granted an accommodation in 2008, exempting her from working overtime. In the view of the commission, "[t]he totality of these specific facts, all of which are supported by substantial evidence in the record, support the Hearing Officer's conclusion that overtime was not an essential function of an inpatient nursing job at Tufts."

---

[19] As the motion judge observed, "[d]espite her medical condition, Dalexis could have worked as a nurse at Tufts and been included in that group of five percent of nurses who performed no overtime at all."

We are aware that a number of cases, arising in a variety of different settings, have concluded that overtime can be an essential function of a job.  See, e.g., McNeil v. Union Pac. R.R., 936 F.3d 786, 790-791 (8th Cir. 2019) (critical call center dispatcher at railroad company); Davis v. Florida Power & Light Co., 205 F.3d 1301, 1305-1306 (11th Cir.), cert. denied, 531 U.S. 927 (2000) (position requiring time-sensitive connecting and disconnecting of customers' electric service for utility company); Tardie v. Rehabilitation Hosp. of R.I., 168 F.3d 538, 543-544 (1st Cir. 1999) (human resources director at hospital).  However, the fact that overtime has been found to be an essential function in certain settings does not compel the conclusion that it is an essential function in the circumstances of the present case.[20]  Moreover, even if, left to our own

_____

[20] Indeed, the cases cited by Tufts are readily distinguishable from the present case.  For example, in Godfrey, 457 Mass. at 121, the plaintiff admitted during the summary judgment proceedings that the key function was essential.  See Rule 9A(b)(5) of the Rules of the Superior Court (2018).  In Cox, 414 Mass. at 376, working conditions were such that Cox (and each splice service technician like him) had to be able to climb a certain type of telephone poll safely, and he had twice failed the pole-climbing test.  In Davis, 205 F.3d at 1303, the employee agreed on his job application to work overtime as a condition of employment; the CBA expressly granted the employer the right to require mandatory overtime, and provided that the employer had to offer voluntary overtime to the most-senior to least-senior employees; and if more overtime was needed, mandatory overtime was imposed on the most junior employees first.  McNeil, 936 F.3d at 788, 790, also involved mandatory overtime policies and a plaintiff who could never perform overtime under any circumstances.  Tardie was decided under the

analysis, we might conclude that overtime was an essential function of the job of an inpatient nurse at Tufts, it is not for us to substitute our judgment for that of the commission. See Southern Worcester County Regional Vocational Sch. Dist., 386 Mass. at 420; Zoning Bd. of Appeals of Wellesley, 385 Mass. at 657.

Tufts's contention that the commission and the motion judge erred as a matter of law is likewise misplaced. While it is true that a task may be an essential function even if its performance is required rarely or only in an emergency, see Cox, 414 Mass. at 386-387, the evidence in the present case supported the commission's conclusion that Tufts could meet the needs of patient care without requiring Dalexis to work overtime. The commission's rejection of Tufts's arguments to the contrary was based on the assessment of the credibility and the weight of the evidence, rather than an erroneous application of the law.[21]

In the present case, the commission applied correct legal

---

FMLA, which has very different language from G. L. c. 151B, see 168 F.3d at 544 ("it is not at all clear that the concept of 'reasonable accommodation' is applicable in the FMLA context"), and also is inapplicable because only one person performed the employee's job and the job itself required more than forty hours a week.

[21] The same may be said about Tufts's challenges to the commission's determinations that Tufts had failed to engage in an appropriate interactive dialogue and had constructively discharged Dalexis.

principles to the hearing officer's findings of fact in evaluating Tufts's claim that overtime work was an essential function of the job of an inpatient nurse.  Though Tufts argues strenuously that the commission reached an incorrect conclusion, under the deferential standard we apply to our review of the commission's decision, we discern no cause to disturb the judgment of the Superior Court affirming the commission's decision.

In her brief, Dalexis has requested an award of reasonable appellate attorney's fees and costs, pursuant to G. L. c. 151B, § 9, and, as the prevailing party, she is entitled to such an award.  See Haddad v. Wal-Mart Stores, Inc. (No. 2), 455 Mass. 1024, 1024-1025 (2010).  Dalexis shall within fifteen days following this decision file with this court and serve on Tufts a motion for determination of the amount of her reasonable attorney's fees and costs incurred on appeal, supported by an affidavit detailing such fees and costs, in accordance with the procedure described in Fabre v. Walton, 441 Mass. 9, 10-11 (2004).  Tufts may, within fifteen days thereafter, file with this court and serve on Dalexis any opposition to the amount of fees and costs so claimed.

Judgment affirmed.

HENRY, J. (concurring).  I fully agree with and join in the majority opinion.  I write separately because I disagree with some assertions by my learned dissenting colleague and because I believe we could affirm on a separate and independent basis: under G. L. c. 151B, even if overtime were an essential function of a job, elimination of a forced overtime requirement could still be a reasonable accommodation based on the record in this case.

First, the dissent's premise that the hearing officer did not address Tufts Medical Center's (Tufts's) evidence is belied by the record.  The hearing officer's findings acknowledge that Tufts maintained that "the ability to work overtime" was an essential function of a registered nurse at Tufts.  The hearing officer simply did not credit Tufts's position.

The dissent notes that Tufts's chief nursing officer testified that overtime work is "often" required to meet the demands of patient care.  Post at    .  That is a far cry from testifying that that ability to work overtime is an essential function.  In any event, the hearing officer weighed that testimony and Tufts's additional evidence on the point against other evidence and found Tufts's claim lacking.  The hearing officer found that the written job description and job postings -- the employer's own statements of what it considers the essential aspects of the position -- did "not specify that

overtime is a job requirement although [the job description] [did] state that [registered nurses] are 'subjected to irregular work hours' as a working condition."  She reviewed the collective bargaining agreement (CBA) and found that it "permit[ted] the [h]ospital to impose overtime but [did] not require that it impose overtime."  She reviewed Tufts's empirical evidence of overtime work at Tufts in different ways.  For example, she analyzed what percentage of inpatient nurses performed no overtime at all (5.33 percent) and the variance in the amount of overtime actually worked (it could be as little as three hours for the entire year or substantially more); and she noted that only fifty-seven percent worked more than forty hours per week, including overtime.

The hearing officer also expressly credited Marie Lunie Dalexis's testimony that in her seven years on the job she was never forced to work overtime and that Dalexis, as charge nurse, never forced anyone else to work overtime.  And Tufts presented no evidence that a nurse was ever mandated or forced to work overtime.  The hearing officer expressly discredited nurse manager Alyson Shea's testimony that Dalexis worked nights and overtime under her supervision.  Indeed, the hearing officer expressly discredited evidence from each of Tufts's percipient

witnesses and decision makers.[1]  At bottom, Tufts offered lay witness testimony of what is an "essential function" of this nursing job without a definition -- legal or otherwise -- and without evaluating whether that testimony is consistent with our antidiscrimination law.  Ability to work overtime in the abstract does not meet the legal test of what constitutes an essential function under G. L. c. 151B.

The hearing officer found that "[t]he evidence also refutes the assertion that overtime is a universal practice at Tufts Medical Center."  This was full consideration of Tufts's evidence that the dissent contends did not occur and an implicit rejection of Tufts's evidence that working overtime was an essential function of the job.  The hearing officer acted within her authority to reject Tufts's position.[2]

---

[1] This in no way indicates that the hearing officer's findings were one-sided.  For example, Dr. Charles Sodikoff testified as an expert witness for Tufts, and the hearing officer concurred with his opinion that Dalexis's postdischarge job search lacked diligence.

[2] The outcome here is consistent with the Legislature's subsequent enactment of a statutory limitation on mandatory nurse overtime, see G. L. c. 111, § 226, inserted by St. 2012, c. 224, § 103, which expressly limits the imposition of mandatory overtime to emergency situations "where the safety of the patient requires its use" and "there is no reasonable alternative."  G. L. c. 111, § 226 (b).  Nursing shortages are a public health risk, and it is foolhardy to discard a handicapped person such as Dalexis, who could perform every nursing task full-time.  To the extent the dissent or Tufts would have us hold that a handicapped person cannot be a qualified handicapped person under G. L. c. 151B because we might have another event

Second, the dissent's contention that "employers define the functions and requirements of the jobs for which they hire," post at    , especially misses the mark in this case because this employment relationship is governed by a CBA.  In other words, the working conditions here were bargained for by the employees, not imposed by the employer.  Our analysis in Cargill expressly endorses consideration of "[t]he terms of a collective bargaining agreement."  Cargill v. Harvard Univ., 60 Mass. App. Ct. 585, 596 (2004), quoting 29 C.F.R. § 1630.2(n)(3) (2003).

Third, the dissent cites Federal cases to state incorrectly that the "employer's judgment" of what job functions are essential is entitled to "substantial weight."  Post at    . This is not Massachusetts law.  Rather, the employer's view of what is an essential function is one factor among several and it is tested against "the actual functioning and circumstances of the particular enterprise involved" (citation omitted).  Cox v. New England Tel. & Tel. Co., 414 Mass. 375, 384 (1993).  The Supreme Judicial Court reiterated this point in Labonte v. Hutchins & Wheeler, 424 Mass. 813, 822-823 (1997):

"The law firm claims that whether a certain function is an

_____

on par with the Boston Marathon bombing, post at    , that is not consistent with the remedial purpose of the statute, it is not consistent with the hearing officer's finding that Dalexis would stay with her patients in an emergency, and it is not consistent with the reality that in a true emergency, on-duty, and even off-duty, medical providers pitch in heroically to their physical limits for the benefit of society.

'essential function' is solely the employer's judgment. That judgment is tested by relevant guidelines such as the work experience of previous incumbents and the current work experience of incumbents in the same or similar jobs. See Cox, supra at 383-384 ('essential function' determined by more than an employer's job description). See also Hall v. United States Postal Serv., 857 F.2d 1073, 1079-1080 (6th Cir. 1988) (stating that an employer's job description not sole factor determining whether function is essential)."

To test the employer's judgment, Labonte lists what the majority here calls the "nonexclusive factors." Ante at    . See Labonte, supra at 823 n.13.

In fact, this court in Cargill, 60 Mass. App. Ct. at 600 n.14, rejected the assertion that the employer's judgment of what is an essential function is entitled to deference. Specifically, we stated:

"[The employer] asserts that 'deference must be given to [the employer]'s judgment concerning the essential functions of the position' (emphasis added). However, in Labonte v. Hutchins & Wheeler, 424 Mass. 813 [(1997)], the Supreme Judicial Court rejected the contention that whether a job function is essential 'is solely the employer's judgment.' Id. at 822. Accord Ward v. Massachusetts Health Research Inst., Inc., 209 F.3d [29,] 34 [(1st Cir. 2000)] ('While we generally give substantial weight to the employer's view of job requirements in the absence of evidence of discriminatory animus, it is only one factor in the analysis' [citations omitted])."

Id. The dissent is wrong in asserting that "the employer's judgment is entitled to 'substantial weight' in the essential functional analysis." Post at    . Reading that "accord" citation to incorporate the Federal "substantial weight" standard into Massachusetts law would ignore Cargill and

subsequent Massachusetts decisions.  For example, a year later, in analyzing the essential job functions of a particular job, we recognized that consistent with Massachusetts law, "[t]he employer's judgment as to which functions are essential is a factor to be considered, but it is not controlling and is to be tested against other benchmarks . . . ."  Smith v. Bell Atl., 63 Mass. App. Ct. 702, 712 (2005).

Good reason exists for not affording the employer's judgment or even its description of the job "substantial weight."  The law protects "handicapped persons" from "deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of [employers] as avoiding exposing others to significant health and safety risks" (emphasis added; citation omitted).  Cox, 414 Mass. at 384.

In other words, the employer's judgment is considered, which of course it should be, and is tested to ensure that it is not tainted by invidious discrimination.

Fourth, to the extent the dissent or Tufts or any party relies on Federal case law, we need to be mindful that the Supreme Judicial Court has often "interpret[ed] G. L. c. 151B to provide more protection against employment discrimination than Title VII [of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1)], in part because of the Legislature's

direction that c. 151B is to be applied liberally." Yee v. Massachusetts State Police, 481 Mass. 290, 299 (2019). See, e.g., Barbuto v. Advantage Sales & Mktg., LLC, 477 Mass. 456, 465 (2017) ("The fact that the employee's possession of medical marijuana is in violation of Federal law does not make it per se unreasonable as an accommodation" under G. L. c. 151B); Dahill v. Police Dep't of Boston, 434 Mass. 233, 240-243 (2001) (defining "handicapped person" more broadly under c. 151B than Americans with Disabilities Act [ADA] due to, among other factors, "two critical" differences between statutes, and concluding that "it is not appropriate to follow the Federal jurisprudence in this case").

Fifth, Tufts expressly argues that the burden was on the employee to prove that overtime was not an essential function of the inpatient nursing position. While the employee bears the burden of proving that the employee is capable of performing the essential functions of a job, see Dahill, 434 Mass. at 243, our case law has not addressed which party bears the burden of proving a function is essential. In my opinion, placing the burden of proof on the employer, who has better access to the relevant evidence, would be consistent with the remedial purpose of the statute. See Cargill, 60 Mass. App. Ct. at 603 (noting statute's "remedial purpose of preserving the employment status of a qualified handicapped person by making reasonable

accommodations").  This is what the United States Court of Appeals for the First Circuit has decided.  See Ward v. Massachusetts Health Research Inst., Inc., 209 F.3d 29, 35 (1st Cir. 2000) ("the defendant [employer], who has better access to the relevant evidence, should bear the burden of proving that a given job function is an essential function").  In future cases, when the question of the essential functions of a job is in dispute, litigants should consider briefing who has the burden of proof.

Sixth, even if overtime were an essential function of the inpatient nursing job, I would still affirm on the basis that elimination of forced overtime can be a reasonable accommodation under G. L. c. 151B, where the employee can perform every task the job requires and elimination of the overtime requirement would not cause the employer an undue hardship.  See G. L. c. 151B, § 4 (16).

The implication of the dissent and Tufts's argument is that if overtime is an essential job function, that is the end of the matter.  They contend that the employer does not have to offer a reasonable accommodation even when it would not cause the employer undue burden.  This would be contrary to the plain language and spirit of G. L. c. 151B and our cases.

General Laws c. 151B, § 1 (16), provides:  "The term 'qualified handicapped person' means a handicapped person who is

capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to [their] handicap" (emphasis added). According to the plain language of this statute, an employer can be required to provide an employee with a reasonable accommodation to allow that employee to perform an essential function of a particular job. See Lipchitz v. Raytheon Co., 434 Mass. 493, 505 (2001) (applying plain language canon to G. L. c. 151B, § 4). Numerous cases underscore the point. For example, in Cox, the court wrote, "[w]hen a handicapped person is not able to perform the essential functions of the job, the court must also consider whether any 'reasonable accommodation' by the employer would enable the handicapped person to perform those functions." Cox, 414 Mass. at 383. Of course there is a limit: "Reasonable accommodation does not require an employer to disregard or waive an employee's inability to perform an essential function of the job." Id.

As the court explained in Godfrey v. Globe Newspaper Co., 457 Mass. 113, 119 (2010): "[a] 'qualified handicapped person' is entitled to a 'reasonable accommodation' that will enable [them] to perform the essential functions of [their] job, so long as the accommodation does not place an undue burden or hardship on the employer." After the court determined that a

particular function was an essential function, the court analyzed whether a reasonable accommodation was possible.  Id. at 121-122.  Similarly, in Barbuto, 477 Mass. at 464, the court held that "[a] qualified handicapped employee has a right under G. L. c. 151B, § 4 (16), not to be fired because of [their] handicap, and that right includes the right to require an employer to make a reasonable accommodation for [their] handicap to enable [them] to perform the essential functions of [their] job."

Indeed, that is precisely what this court held in Cargill. There, a lead reference librarian employed by a university suffered from rheumatoid arthritis.  The issue was whether it was essential that she perform two physical tasks: paging/retrieval and shelving of "sometimes quite heavy" books. Cargill, 60 Mass. App. Ct. at 587.  On our review of a summary judgment for the employer, we held that "the record present[ed] significant and genuine issues of disputed material fact, both as to [1] whether paging/retrieval and shelving constitute essential functions of the reference librarian job and, [2] if so, whether a reasonable accommodation could have been tailored without undue hardship to [the employer]."  Id. at 588.  We specifically held that even if the two physical tasks were essential functions, "the inquiry does not end there," id. at 603, because the employee "offered sufficient evidence to make a

facial showing that a reasonable accommodation was possible, including, but not limited to, utilization of the available student workers and part-time staff employees, and the use of shelving carts," id. at 604.  Accordingly, we reversed an award of summary judgment to the university employer.  In other words, even an essential function of the job can be subject to a reasonable accommodation, including that someone else do the task if it would not put an undue burden on the employer.  This was consistent with the plain language of the statute.

Cases involving the question whether overtime work is an essential function do not fit neatly into the established rubric.  In an overtime case, as here, the employee is capable of performing each and every physical and mental task required for the job.  When the court stated in Cox that a "[r]easonable accommodation does not require an employer to disregard or waive an employee's inability to perform an essential function of the job," Cox, 414 Mass. at 383, that statement was in the context of whether the employee expressly possessed a skill (i.e., was "able") or could perform a task -- safely climbing a particular type of telephone pole.  See id.  In addition, Cox based this statement on its finding that "the Federal law is clear, and there is no reason to construe the Commonwealth's law differently."  Id. at 390.  However, as already explained supra, since Cox, the first disability discrimination case decided

under G. L. c. 151B, § 4 (16), by our highest court, the Supreme Judicial Court has often departed from the Federal cases to require greater protections under c. 151B than the Federal law requires, and a split in the circuits has developed on the question of schedule accommodations.[3]  Similarly, when the court in Godfrey ruled that "[n]either elimination of an essential duty from a position nor assignment to an unrelated position are 'reasonable accommodations' within the meaning of G. L. c. 151B, § 1," Godfrey, 457 Mass. at 124, the employee was not physically able to perform what he admitted was an essential task --

---

[3] The First Circuit addressed a split in the circuits on the same issue:

> "Our inquiry is somewhat complicated by the interrelationship between the terms 'essential function' and 'reasonable accommodation.' . . .  Particularly with attendance cases -- as opposed to a simpler case where, for instance, a disabled employee needs to sit rather than stand to perform the essential functions of a job -- it is difficult to separate the analysis in this manner, and as a result courts vary in their treatment of attendance problems in the ADA context.  Some courts focus on whether a fixed schedule is an essential requirement for the specific job and end the analysis there. . . .  Some courts conclude that a fixed schedule is essential but move on to consider whether there is an effective reasonable accommodation. . . .  And others confine the attendance issue to whether a modified schedule is a reasonable accommodation to perform the essential functions of the job."

Ward, 209 F.3d at 33-34.  Because the First Circuit concluded that the function was not essential, it did not have to address the circuit split.

climbing on the printing presses.

The question in an overtime case is different. In a small workplace, it might be untenably burdensome on the employer and other employees if the disabled person is excused from overtime. Yet, elimination of overtime for one worker might impose a de minimis burden or no burden at all in a larger workplace, such as Tufts.[4] Moreover, the agency guidelines expressly mention "modifying work schedules" as a reasonable accommodation. Massachusetts Commission Against Discrimination, Guidelines: Employment Discrimination on the Basis of Handicap, Chapter 151B, § II.C (1998).[5] See ADA, 42 U.S.C. § 12111(9)(B) ("'reasonable accommodation' may include . . . job restructuring, part-time or modified work schedules").

Here, Dalexis was a disabled person who possessed all of the skills and could perform all of the tasks required of a Tufts nurse for forty hours a week on an irregular day-rotator

---

[4] As the majority acknowledges, the need to require overtime is to some extent subject to the control of the employer, who may staff leanly or robustly for variable capacity. For example, the employer may maintain a float pool, as this employer does. Also, the impact of overtime can vary depending on whether overtime is offered on a seniority basis and mandatory overtime is imposed on a reverse seniority basis.

[5] "[W]e give 'substantial deference' to the guidelines interpreting G. L. c. 151B promulgated by the [Massachusetts Commission Against Discrimination], although we recognize that the guidelines do not carry the force of law." Gannon v. Boston, 476 Mass. 786, 792 (2017).

shift with day and evening work.  She is not seeking what

Godfrey condemned -- that the employer create a different

position.[6]  Even if Godfrey and Cox are controlling on a schedule

issue and not just a physical task, when applied in the context

of overtime where scores of other employees could work overtime

and where some affirmatively want to work overtime, those cases

are inconsistent with the plain language of c. 151B and should

be limited accordingly.

The hearing officer expressly found based on "the unique

facts of this case," that "elimination of an overtime

requirement" in Dalexis's schedule was a reasonable

---

[6] The other cases Godfrey cites are similarly
distinguishable.  In Russell v. Cooley Dickinson Hosp., Inc.,
437 Mass. 443, 454 (2002), the plaintiff could not physically
perform the computer tasks that were the essential functions of
the position.  The Russell case also is distinguishable because
the employer did provide reasonable accommodations as to certain
aspects of the job, just not indefinite leave or transferring
the employee to a different department, and the plaintiff,
unlike Dalexis, never sought to return to her original job ("the
position involved" for purposes of G. L. c. 151B, § 4 [16]),
with accommodation.  Russell, supra.  In Beal v. Selectmen of
Hingham, 419 Mass. 535, 542 (1995), the court concluded "the
plaintiff has failed to demonstrate that she is capable of
performing the essential functions required of a police officer"
because she could not fulfill the "fundamental duty" of
"protect[ing] the public at large," and her "capacity for
fulfilling th[ose] duties . . . would not be enhanced by any
reasonable accommodation."  Among other things, due to her
disabilities, "she [was] at risk for blackouts in high-stress
situations."  Id.  The employees in these cases could not
perform their jobs.  Dalexis, in contrast, could perform the
inpatient nurse job, even with irregular hours.  She just could
not perform overtime (absent a true emergency) when many, many
others could.

accommodation that did not impose an undue hardship on Tufts. This determination was well grounded in the record, which established that (1) Tufts had a large pool of inpatient nurses from which it could obtain nurses to work overtime; (2) some nurses preferred overtime and night-shift work and sought it out in order to earn money and to be relieved of work obligations during the day; (3) Tufts also had "per diems" and "floaters" to cover nursing absences; (4) five percent of nurses did not work any overtime in fiscal year 2009; (5) day-evening rotating nursing schedules existed at Tufts, and Dalexis was available to work these shifts; (6) Dalexis assured Tufts that if an emergency were to occur requiring her to stay past her normal hours, she would work overtime because she would never abandon a patient; and (7) the CBA did not mandate the imposition of overtime, thereby rendering the accommodation unreasonable. Even Tufts concedes that those who worked overtime averaged less than one hour of overtime per week. Modifying Dalexis's overtime schedule would have accommodated her disability and fulfilled the purpose G. L. c. 151B was enacted to achieve without placing an undue burden on Tufts's ability to run a well-staffed hospital.

Legislative intent is paramount. The goal of G. L. c. 151B is to "protect[] handicapped individuals from deprivations" based on invidious discrimination. Cox, 414 Mass. at 383-384.

It defies all reason to interpret c. 151B to provide that if a reasonable accommodation that would not create an undue hardship on the employer is available, the employer can lawfully discharge the disabled employee.  That would be inconsistent with the plain language and remedial purpose of c. 151B, which the Legislature has directed "shall be construed liberally." G. L. c. 151B, § 9.  This is a separate basis to affirm.

ENGLANDER, J. (dissenting).  Throughout this case, Tufts Medical Center's (Tufts's) position has been that its inpatient nurses must be able to work overtime if circumstances require it -- that is, the ability to work overtime is an essential function of the inpatient nursing position.  The plaintiff, Marie Dalexis, informed Tufts that she did not have that ability.  She told Tufts this in December of 2009, via a doctor's note explaining that she "cannot work overtime."  And she confirmed the restriction in May of 2010, during the grievance process.  Because Dalexis was not able to work overtime, the critical issue before the Massachusetts Commission Against Discrimination (commission) hearing officer was the following:  is the ability to work overtime an essential function of the inpatient nursing job at Tufts?  Although she ruled for Dalexis, the hearing officer did not make a finding on this issue.  Indeed, the hearing officer did not even address some of the most important evidence bearing on the question.  And although the commission concluded that such a finding was "implicit," it too failed to address the important evidence bearing on the question.  In my view, those failures require a remand for further proceedings.

Under the case law, the question whether a job function is "essential" is answered by applying a multifactor test.  See Cargill v. Harvard Univ., 60 Mass. App. Ct. 585, 595-596 (2004).

The first listed factor is "[t]he employer's judgment as to which functions are essential." Id. at 596. The importance of this factor is hardly surprising; employers define the functions and requirements of the jobs for which they hire, and thus courts must of course consult the employer's own views as to what functions are essential. Accordingly, although not dispositive, the employer's judgment is entitled to "substantial weight" in the essential function analysis. See id. at 600 n.14.[1] See also Mulloy v. Acushnet Co., 460 F.3d 141, 147 (1st Cir. 2006) ("[i]n the absence of evidence of discriminatory animus, 'we generally give substantial weight to the employer's view of job requirements'" [citation omitted]); Ward v. Massachusetts Health Research Inst., Inc., 209 F.3d 29, 34 (1st Cir. 2000) (same).[2] As the United States Court of Appeals for the First Circuit put it, the essential function inquiry "is not

---

[1] The concurrence misreads Cargill as holding that the employer's judgment is not entitled to substantial weight. All Cargill says is that the employer's stated position as to essential job functions cannot be dispositive -- in other words, the employer's judgment "is not controlling and is to be tested against other benchmarks." Smith v. Bell Atl., 63 Mass. App. Ct. 702, 712 (2005). Cargill cites and quotes approvingly, however, to the "substantial weight" formulation in the Federal cases. See Cargill, 60 Mass. App. Ct. at 600 n.14.

[2] "We look to the Federal cases decided under the [Americans with Disabilities Act] as a guide to the interpretation of G. L. c. 151B." Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 451 n.6 (2002). See Cargill, 60 Mass. App. Ct. at 595 ("Federal courts define 'essential functions' along similar lines" to commission guidelines).

intended to second guess the employer or to require the employer to lower company standards" (citation omitted).  Mulloy, supra.

Here, Tufts maintained that the ability to work overtime is essential to ensure that at all times -- through snowstorms, emergencies, and (as we now know) pandemics -- Tufts had sufficient nurses in the building to meet "the vital and unpredictable demands of patient care."  Tufts introduced evidence to that effect before the hearing officer -- that is, evidence of its own judgment as to job essentials.  Tufts's chief nursing officer and senior vice-president of patient care services testified that all nurses were required to be available to work overtime, most nurses did in fact work overtime, and no nurse received a permanent "exception" from the overtime requirement.  The chief nursing officer also explained that despite having a system in place to minimize overtime work, such work is "often" required to meet the demands of patient care. As an example, a Tufts nurse manager cited the Boston Marathon bombings, when unexpected demands for patient care required all available staff to remain on shift to meet patient needs. Dalexis herself acknowledged that it is "fundamentally important" -- and also that it was her ethical obligation as a nurse -- to stay on the job until she is relieved if patient

care necessitates it.[3]  This evidence, if credited, supports that the _ability_ to work overtime is an essential function of an inpatient nurse at Tufts.[4]

The hearing officer, however, did not address this evidence concerning Tufts's judgment, nor did she actually find that the ability to work overtime was not an essential job function.  And although the commission determined that the hearing officer "implicitly" found that overtime was not an essential function, the commission did not directly address Tufts's evidence either, nor did it address the very first factor in the analysis it was supposed to apply.  See Doe, Sex Offender Registry Bd. No. 11204

---

[3] The hearing officer accorded great weight to Dalexis's testimony that in her own experience, "no such emergencies" had occurred, but such anecdotal evidence from a single employee cannot bear the weight it was accorded, particularly where the contrary evidence was not addressed.

[4] I do not mean to suggest that the other factors listed in Cargill are unimportant.  Those factors also must be addressed, although of course the factors are not all of equal weight, and their significance will vary from case to case.  In my view, the commission's discussion of the other factors was also lacking here.  For example, the commission relies on the fact that in a single fiscal year, 2009, five percent of the nurses did not work overtime -- as if this shows that the ability to work overtime is not essential.  That logic is faulty.  First of all, the cases make clear that a function can be essential even if it is rarely required.  See Cox v. New England Tel. & Tel. Co., 414 Mass. 375, 386-388 & n.4 (1993) (gaff climbing essential function of job even if rarely performed in particular area). And second, what the data showed is that overtime is commonplace; the fact that one in twenty nurses did not work overtime in a particular year hardly demonstrates that Tufts can forgo a nurse's ability to do so, in a pinch.

v. <u>Sex Offender Registry Bd</u>., 97 Mass. App. Ct. 564, 575 (2020)

("[t]roublesome facts . . . are to be faced rather than ignored"

by agency decision makers [citation omitted]).  For example, the

commission's analysis failed even to discuss Tufts's evidence

that exempting a nurse from overtime would risk patient care.

Where the commission ruled that the ability to work overtime was

not an essential job function, but neither the hearing officer

nor the commission addressed a critical factor in the analysis

or some of the most important evidence directed thereto, the

decision is erroneous as a matter of law.  See <u>Uvello</u> v.

<u>Director of the Div. of Employment Sec</u>., 396 Mass. 812, 815-817

(1986) (remand required where agency failed to make findings "on

all material issues").  Unlike the majority, I cannot infer the

required finding from discussions that do not address the issue.

In my view, a remand is required.  I therefore respectfully

dissent.[5]

---

[5] The concurrence devotes several pages to arguing that even
if Tufts showed that the ability to work overtime was an
essential job function, the judgment here could still be
affirmed because "elimination of forced overtime can be a
reasonable accommodation." <u>Ante</u> at    .  Put differently, the
concurrence's position is that even if Dalexis could not perform
all the essential job functions (because she could not work
overtime), she should nevertheless be deemed "qualified" for the
job under G. L. c. 151B, because <u>some other employee</u> could
perform that function as a reasonable accommodation.  The
position the concurrence advances finds no support in the
statutory language, or the case law.  As the majority opinion
notes, <u>ante</u> at    , it is unquestionably the law that to be a
"qualified handicapped person," the employee must be personally

---

capable of performing all essential job functions.  See Cox, 414 Mass. at 390 ("the Federal law is clear, and there is no reason to construe the Commonwealth's law differently, that reasonable accommodation does not include waiving or excusing an inability to perform an essential job function").  This includes the ability to work at particular times, if that ability is essential to the job.  See, e.g., McNeil v. Union Pac. R.R., 936 F.3d 786, 790-791 (8th Cir. 2019); Laurin v. Providence Hosp., 150 F.3d 52, 60-61 (1st Cir. 1998).  Nothing in the First Circuit's decision in Ward, 209 F.3d 29, or the cases cited in Ward, is to the contrary.